**LOS ANGELES POLICE PROTECTIVE LEAGUE, a California corporation, et al., Plaintiffs,**

v.

**Darryl F. GATES, individually and as Chief of Police of the City of Los Angeles, et al., Defendants.**

**No. CV 82–3392 RG (MCx).**

United States District Court, C.D. California.

Jan. 17, 1984.

Gregory G. Petersen & Associates, Santa Ana, Cal., for plaintiffs.

Ira Reiner, City Atty., Frederick N. Merkin, Senior Asst. City Atty., Lewis N. Unger, Deputy City Atty., Los Angeles, Cal., for defendants.

## OPINION

GADBOIS, District Judge.

This lawsuit arises out of a 1981–82 investigation by the Los Angeles Police Department, ("LAPD"), into widespread corruption among officers of the Hollywood Division. In late 1981, Internal Affairs Division ("IAD") investigators learned that Hollywood Division officers were committing on-duty burglaries. IAD set up a "sting" operation which resulted in the December 7, 1981 arrest of two LAPD officers—Ronald Venegas and Jack Meyers—as they left the sting site with stolen property.

Several other Hollywood Division officers, including Roger Gibson, reported to the sting site on December 7. IAD questioned and searched those officers immediately after they returned to the station in order to discover whether any of them had

stolen chemically-dusted money from the burglarized store. The search produced no evidence of theft by Gibson. Nevertheless, he eventually became a suspect in IAD's investigation into widespread misconduct in the Division.

During that investigation, IAD interviewed Gibson several times. While interviewing him on January 20, 1982, IAD gave him his *Miranda* rights, and ordered him not to discuss the investigation with other suspects or witnesses in the Division until IAD had completed its investigation. After the interview, investigators searched Gibson's property for evidence of stolen tools and appliances. On April 15, investigators gave Gibson an administrative order to allow the search of his garage and private vehicles for stolen property. Gibson refused, and was charged with insubordination.

Three months after IAD finished its investigation, the Board of Rights held an administrative disciplinary hearing. The Board found Gibson guilty of thirteen charges, including insubordination and lying to investigators about on-duty drinking and sex with prostitutes. Gibson was found not guilty of committing on-duty burglaries. LAPD fired Gibson, but he was never criminally prosecuted.

On January 14, 1983, plaintiffs—Los Angeles Police Protective League ("LAPPL"), Roger Gibson, and Gibson's wife and children—filed an amended complaint seeking relief under 42 U.S.C. § 1983 for violations of plaintiffs' civil rights during the investigation. Defendants have moved for summary judgment on plaintiffs' First, Fourth, Fifth, and Sixth Amendment claims. Plaintiffs' due process and privacy claims, and their pendent state claims, will be addressed later in the litigation.

## I.

## FIRST AMENDMENT CHALLENGE

Plaintiffs challenge the order forbidding Gibson from discussing the investigation with other suspects or witnesses in the Hollywood Division until IAD had completed its investigation. Plaintiffs claim that the order infringed Gibson's right of free speech and was vague and overbroad.

### A. *Infringement of Gibson's Free Speech*

The Supreme Court, in *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), established the test for determining whether governmental restrictions on its employees' speech violated the First Amendment.[1]

> The problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees.

*See also Fracaro v. Priddy*, 514 F.Supp. 191, 196 (M.D.N.C.1981) (applying *Pickering* test to a state's confidentiality order binding its employees).

Gibson's interest in uninhibited speech consisted of discussing the investigation with other Hollywood Division suspects and witnesses *during* the IAD's investigation, rather than *after* it. LAPD's interest in temporarily restricting Gibson's contact with other suspects and witnesses consisted of preventing suspected officers from collaborating on their stories, fabricating alibis, and disposing of stolen property.

■ The balance in this case clearly weighs in favor of the State. The State has a compelling interest in protecting the integrity and efficiency of its police departments. *Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976); *Kannisto v. City and County of San Francisco*, 541 F.2d 841, 845 (9th Cir. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977); *Waters v.*

---

1. Plaintiffs challenge the order not because it prevented Gibson from commenting on the investigation (it did not); but because it prevented him from obtaining information from, or ex-changing information with, other suspects or witnesses. The general principles of *Pickering* still apply to the instant case.

*Chaffin,* 684 F.2d 833, 836 (11th Cir.1982). Especially in the face of suspected widespread corruption, the state had an overriding concern with conducting a spotless investigation and quickly restoring the public's faith in its police department.

The order did not prevent Gibson from discussing the case with his representative, present during all interrogations, or his attorney, and the order applied only until IAD completed its investigation. Moreover, the order did not prohibit Gibson from talking with other officers about matters outside the investigation. Gibson had about three months after IAD finished its investigation to discuss the case with other Hollywood Division officers, and prepare his defense.

Plaintiffs complain that two witnesses died before IAD lifted the order, so that Gibson never had the opportunity to interview them. First, even had there been no order, they might have died before Gibson had a chance to interview them. Second, on balance, the State's interest in effectively investigating police corruption outweighed the speculative chance that a witness would die during IAD's eight-month investigation. Third, plaintiffs have not shown how any testimony from the dead witnesses would have materially helped Gibson's defense.

The cases cited by plaintiffs holding that the government may not impose an obligation of secrecy on grand jury witnesses may easily be distinguished. *In Re Russo,* 53 F.R.D. 564, 569–71 (C.D.Cal.1971), determined whether the government had to provide a witness with a transcript of his grand jury testimony. The court decided the case under F.R.Crim.P. Rule 6(e), not the First Amendment; the issue of freedom of expression did not arise. Moreover, under First Amendment analysis, a grand jury witness does not stand in the same position as a government employee. *Pickering* left no doubt that the First Amendment allows significantly greater restrictions by the government on its employees' employment-related speech than on the speech of regular citizens. *Pickering v.*

*Bd. of Education,* 391 U.S. at 568, 88 S.Ct. at 1734. *In Re Vescovo Special Grand Jury,* 473 F.Supp. 1335, 1336 (C.D.Cal. 1979), may be distinguished on essentially the same grounds as *Russo.*

*Beacon Journal Pub. Co. v. Unger,* 532 F.Supp. 55, 59 (N.D.Ohio 1982), determined whether the state could require grand jury witnesses to swear that they would not reveal the substance of their grand jury testimony. The court specifically refrained from considering the First Amendment issue and decided the case on the state's analogue to F.R.Crim.P. Rule 6(e). Moreover, the oath there did not limit the secrecy obligation in terms of time or persons with whom the witness could speak. *Id.* at 57, 59. Finally, the court specifically recognized that the state could impose a veil of secrecy on grand jury witnesses under proper circumstances on a case-by-case basis. *Id.* at 59.

### B. *Vagueness*

■ Plaintiffs' vagueness challenge may be disposed of summarily. First, Gibson said he understood the order at the time he received it. Declaration of Elayne Yochem, July 7, 1982, Exhibit A, pp. 37–38. Second, the order clearly set out the parameters of prohibited discussion. It did not force "men of common intelligence [to] guess at its meaning." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). It was not unconstitutionally vague.

### C. *Overbreadth*

■ Plaintiffs' overbreadth challenge is also without merit. The order terminated upon the completion of IAD's investigation. The order only prohibited Gibson from discussing the investigation with those Hollywood Division officers involved in the investigation. It did not prevent him from discussing the case with his representative or his attorney. It did not prevent him from successfully preparing a defense to the battery theft charge against him. Gibson has not shown how a narrower order could have accomplished the State's com-

pelling objective, and he has not shown how the order's alleged overbreadth prejudiced him in defending the charges against him.

Summary judgment is granted against the plaintiffs' First Amendment claims. All requests for declaratory and injunctive relief are denied. The IAD issues the type of order challenged here on a limited, case-by-case basis. See Defendants' Exh. 88, p. 6. Any challenge to future IAD orders must be analyzed under the particular circumstances found there. *See Bickel v. Burkhart,* 632 F.2d 1251, 1257 (5th Cir. 1980).

## II.

## RIGHT TO COUNSEL

A. *Sixth Amendment*

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to ... have the assistance of counsel for his defence." Plaintiffs apparently claim that defendants violated Gibson's Sixth Amendment right to have counsel present during IAD interrogations involving possible criminal activity by the officer.[2]

 First, the Sixth Amendment does not apply because Gibson never faced a "criminal prosecution" or any proceeding threatening his liberty. *See Middendorf v. Henry,* 425 U.S. 25, 34, 96 S.Ct. 1281, 1287, 47 L.Ed.2d 556 (1976). The right to counsel does not arise until formal judicial criminal proceedings have begun, and they never did here. *See Kirby v. Illinois,* 406 U.S. 682, 688–89, 92 S.Ct. 1877, 1881–82, 32

L.Ed.2d 411 (1972); *United States v. Kenny,* 645 F.2d 1323, 1338 (9th Cir.) *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981); *see also Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

> Until the defendant has been arrested or indicted, whatever suspicions the police might have, the defendant is not an "accused," and, therefore, *Massiah* is inapplicable.

*United States v. Zazzara,* 626 F.2d 135, 138 (9th Cir.1980); *but cf. United States v. Gouveia,* 704 F.2d 1116 (9th Cir.) (en banc), *cert. granted,* —— U.S. ——, 104 S.Ct. 272, 78 L.Ed.2d 254 (1983) (applying different rule to unique circumstances of prison administrative detention where detention affected subsequent criminal prosecution of detained prisoner).

Plaintiffs have presented no support for the proposition that the Sixth Amendment applies to non-criminal administrative proceedings involving no loss of liberty. In fact, the courts have held that it does not so apply. *See Haven v. United States,* 403 F.2d 384, 385 (9th Cir.1968), *cert. dismissed,* 393 U.S. 1114, 89 S.Ct. 926, 22 L.Ed.2d 120 (1969); *DeWalt v. Barger,* 490 F.Supp. 1262, 1272 (M.D.Pa.1980); *Ely v. Honaker,* 451 F.Supp. 16, 19 (W.D.Va. 1977), *aff'd,* 588 F.2d 1348 (4th Cir.1978); *see also Middendorf v. Henry,* 425 U.S. at 34, 96 S.Ct. at 1287.

Second, assuming Gibson had a right to have counsel present during IAD questioning, plaintiffs have not demonstrated a single specific instance where Gibson requested and was denied presence of counsel.[3] In

---

**2.** Plaintiffs do not clearly explain when they think the Sixth Amendment applies during an IAD investigation. IAD's investigation of Gibson began as a dual-track criminal and administrative inquiry. As explained below, during the January 20, 1982 interview, Gibson refused to waive his *Miranda* rights, so the investigation became solely administrative. Because no criminal prosecution ever resulted from the first part of the investigation, and because the Sixth Amendment does not apply to administrative, non-criminal proceedings involving no loss of liberty, the Sixth Amendment did not apply to any phase of the IAD investigation.

**3.** Plaintiffs point to an ambiguous deposition statement by Jay Frey, Gibson's first defense representative, in support of their claim that defendants deprived Gibson of his Sixth Amendment right to counsel. Frey testified that he did not remember any time during any interview he attended that an attorney was allowed to come in. Deposition of Jay O'Reilly Frey, Aug. 2, 1983, p. 80. While his assertion must be accepted as true for purposes of this summary judgment motion, the record of the interviews Frey attended (January 20, 1982 and April 5, 1982) demonstrates unequivocally that Gibson never asked to have an attorney present, and IAD

fact, uncontroverted declarations by defendants show that they never denied Gibson the right to have a lawyer present during questioning. See Defendants' Exh. 131 & 132. For at least six years, LAPD has ostensibly allowed an officer who reasonably believes he may be disciplined for misconduct to have an attorney (as well as his defense representative) present during questioning.[4] Defendants' Exh. 130.

### B. *Fifth Amendment Right to Counsel*

*Miranda v. Arizona,* 384 U.S. 436, 469–73, 86 S.Ct. 1602, 1625–27, 16 L.Ed.2d 694 (1966), established that the Fifth Amendment prohibits the prosecution from introducing statements made by a defendant during custodial interrogation unless officers warn defendant of his right to have counsel present during questioning.

■ Defendants did not violate Gibson's Fifth Amendment right to counsel. First, Gibson has not shown that he requested and was denied counsel. In fact, the one time Gibson requested counsel, investigators granted his request. See Declaration of Elayne Yochem, July 7, 1982, Exh. "C", pp. 25–28. Second, Gibson has not shown that any statement he made in the absence of denied counsel was used against him in a criminal prosecution. Third, Gibson never even faced a criminal prosecution, or any proceeding which threatened his liberty.

Summary judgment is granted for the defendants on the issue of the alleged violation of plaintiffs' constitutional right to counsel.

> never told him he could not have one present. Declaration of Elayne Yochem, July 7, 1982, Exhs. A & B. Frey's testimony must be interpreted as merely his recollection that no attorney was present; neither he nor the plaintiffs can point to a single instance in which Gibson asked for and was denied the presence of counsel.

4. Because defendants have demonstrated that they never denied Gibson an opportunity to have counsel present during questioning, it is unnecessary to address the comment by Sgt. Colby, see Declaration of Elaine Yochem, July

### III.

## FOURTH AMENDMENT SEARCH AND SEIZURE CLAIMS

IAD officers arrested Venegas and Myers as they left a burglarized store on December 7, 1981. Several other Hollywood Division officers, including Roger Gibson, had been at the scene of the "sting" operation set up by IAD. To determine whether any of them had stolen property from the store, IAD immediately interviewed and searched those officers. Investigators searched Gibson's patrol car, private car, briefcase, and police locker, and blacklighted his hands, wallet, and uniform.

On January 20, 1982, IAD investigators once again searched Gibson's locker and private car at the station, his home, and tools and appliances at his home.[5]

On April 15, 1982, investigators returned to Gibson's house and asked to search his garage and his family's cars. Gibson refused. IAD gave him an administrative order[6] to allow the search but Gibson again refused. LAPD charged Gibson with insubordination, and the Board of Rights sustained the charge.

Gibson seeks: relief declaring illegal the searches on December 7, 1981 and January 20, 1982, and the administrative order to search on April 15, 1982; general, special, and punitive damages; and injunctive relief prohibiting future illegal searches and preventing the imposition of discipline arising out of Gibson's refusal to allow the April 15 search. The Gibson family seeks general, special, and punitive damages arising out of the allegedly illegal searches. The

> 7, 1982, Exh. C, p. 28, raising some question as to whether in fact LAPD does generally allow an interrogated officer to have both a lawyer and a defense representative during interrogation.

5. The search on February 10, 1982, of Gibson's "Sam Browne" gun belt is no longer in issue because plaintiffs have not included this incident in their amended complaint.

6. Since, earlier in the day Gibson had already been read, and refused to waive, his *Miranda* rights, nothing turned up at the search could have been used against him criminally.

PPL seeks declaratory and injunctive relief.

## A. *December 7, 1981 Searches*

Defendants argue that none of the December 7 searches violated Gibson's rights because he either consented to the searches or had no reasonable expectation of privacy in the areas searched.

### *Patrol Car and Briefcase*

Defendants argue that Gibson consented to the search of his patrol car and briefcase. Voluntary consent would obviate the need for a search warrant, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973), but the question of consent to the search of both the car and the briefcase remains a genuine issue of material fact, and thus not subject to summary judgment.

While Gibson has admitted twice that he consented to the patrol car search, Defendants' Exh. 86, Att. 3 and Defendants' Exh. 201, pp. 14–15, defendants have conceded that IAD officers did not even ask for his consent, Defendants' Memorandum of Points and Authorities in Support of Summary Judgment, p. 8. The two officers involved in the search split on whether Gibson actually consented. Officer Tomita testified that Gibson consented to the search. Defendants' Exh. 75, p. 7. Officer Mears testified that he did not ask for consent. Defendants' Exh. 72, p. 18.

When Officer Mears searched Gibson's patrol car he found Gibson's briefcase in the trunk. It is unclear whether Mears obtained consent for the search. Gibson admits that he gave consent, Defendants' Exh. 86, Att. 3 and Defendants' Exh. 201, p. 14, but Officer Mears testified in deposition that he did not ask for permission to

search the briefcase, Defendants' Exh. 72, pp. 18, 22–23.

While the issue of consent remains disputed, Gibson's § 1983 claim relating to his patrol car and briefcase must nevertheless be dismissed. Under *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), "a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* at 691, 98 S.Ct. at 2036. In other words, a city cannot be held liable for its police officers' acts unless they are pursuant to "official municipal policy." *Id.*

■ On December 29, plaintiffs stipulated to the dismissal with prejudice of Thomas Mears, the only officer who searched Gibson's patrol car and briefcase.[7] Moreover, plaintiffs have taken the position, supported by competent declarations, that LAPD has no established policy, practice, or custom governing investigative searches of accused officers' patrol cars and objects found therein. See Plaintiffs' Memorandum of Points and Authorities in Response to Two Questions of the Court, November 30, 1983, pp. 2–7 (and supporting declarations). Accepting as true the representations in plaintiffs' Memorandum and Declarations, plaintiffs have admitted that Officer Mears did not conduct the search pursuant to "official municipal policy or custom."[8] Thus, under *Monell*, the city cannot be liable, and the claim regarding the patrol car and briefcase must be dismissed.

### *Personal Car*

Both sides agree that Gibson permitted Mears to search his private car at the Hollywood station on December 7. Defendants' Exh. 86, Att. 3; Defendants' Exh. 201, pp. 11–12, 14–15; Defendants' Exh. 72, p. 18; Defendants' Exh. 75, p. 7. Plaintiffs

---

**7.** Plaintiffs have failed to present any evidence that any of the remaining defendants ordered Mears to search the briefcase, or the car itself. Apparently, Sergeant Small, not a defendant here, told Mears to search the car. Defendants' Exh. 204, pp. 5–7. Regardless of who told Mears to search the car, as explained below, no one told Mears what to do if he discovered an officer's personal briefcase in the trunk, so none

of the individual defendants can be liable for Mears' decision to search the briefcase.

**8.** In fact, Mears, the searching officer, testified that he has never been told, and does not know, of any departmental policy governing the search of an accused officer's patrol car and items found inside. Defendants' Exh. 204, p. 7.

argue, however, that Gibson's permission did not constitute the "voluntary consent" necessary to waive his Fourth Amendment rights.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), requires that a court examine all the circumstances in deciding the factual question of whether consent to a search was coerced or voluntary. Both the characteristics of the suspect and the details of the search should be examined. *Id.* at 226, 93 S.Ct. at 2047.

In *Schneckloth,* the Court listed the factors of youth, lack of education, low intelligence, lack of advice on constitutional rights, length of detention, repeated and prolonged nature of questioning, and the use of physical punishment such as deprivation of food or sleep. *Id.*

Gibson's consent to the search of his private car involves no genuine issue of material fact. Gibson had worked for LAPD for sixteen years; he apparently was educated and not of low intelligence; as a 16-year police veteran he certainly knew his constitutional rights regarding searches; he was not detained when he consented to the search; IAD did not repeatedly ask for his consent to search; obviously Gibson suffered no physical punishment; and Gibson admitted that IAD used no coercive tactics in obtaining his consent, Defendants' Exh. 201, pp. 11–12. The only real issue on consent to the search of the private car is whether IAD's mere request to search coerced Gibson's consent.

■ Gibson has twice admitted that he consented to the December 7, 1981 searches "in order to exonerate himself." Defendants' Exh. 86, Att. 3; Defendants' Exh. 201, pp. 14–15. He cannot claim a Fourth Amendment violation after explicitly agreeing to the search in order to benefit himself. In any case, Gibson's subsequent conduct in limiting the scope of the IAD search on January 20, 1982 and outrightly refusing to allow a search on April 15, 1982

unmistakably demonstrates that IAD's power and authority did not coerce Gibson into consenting to the search of his private car. Summary judgment here is granted to defendants.

### Station Locker

Gibson voluntarily consented to the search of his station locker at the same time he consented to the search of his private car. Defendants' Exh. 86, Att. 3; Defendants' Exh. 201, pp. 10–11, 14–15; Defendants' Exh. 72, p. 18; Defendants' Exh. 75, p. 7.

■ Even if Gibson had not consented to the search, the Fourth Amendment offers him no protection because he had no reasonable expectation of privacy in the locker. *See United States v. Bunkers,* 521 F.2d 1217 (9th Cir.), *cert. denied,* 423 U.S. 989, 96 S.Ct. 400, 46 L.Ed.2d 307 (1975). Under California Government Code § 3309, a police officer's locker may be searched "in his presence, or with his consent, or ... where he has been notified that a search will be conducted." Just as in *Bunkers,* the regulation here eliminated Gibson's reasonable expectation of privacy in his locker if he observed, or was notified of, the search. *United States v. Bunkers,* 521 F.2d at 1220.[9] Gibson did observe, get notification of, and consent to the locker search on December 7. *United States v. Speights,* 557 F.2d 362 (3rd Cir.1977), does not apply because, unlike *Bunkers,* no regulation in *Speights* governed the use of the officer's locker. *Speights* itself explicitly distinguishes *Bunkers* as a case relying on a specific regulation and practice to find that an expectation of privacy was unreasonable.

Summary judgment here is granted to defendants.

### Blacklighting

Whether Gibson voluntarily consented to the blacklighting of his hands, uniform, and wallet on December 7, 1981 remains a disputed factual issue. See Defendants'

**9.** Plaintiffs have not challenged the constitutionality of § 3309 so they may not complain that the state regulation unlawfully deprived Gibson of his reasonable expectation of privacy.

Exh. 201 at pp. 12–14. However, no material facts regarding the blacklighting remain in controversy so the issue may be disposed of by summary judgment.

■ Of the few courts considering the question, most have held that blacklighting does not constitute a search under the Fourth Amendment. *See Commonwealth v. DeWitt*, 226 Pa.Super. 372, 314 A.2d 27, 30–31 (1973) (limited and controlled blacklighting not a search); *United States v. Richardson*, 388 F.2d 842, 845 (6th Cir. 1968) (cited with approval in *United States v. D'Amico*, 408 F.2d 331, 333 n. 1 (2nd Cir.1969)); *United States v. DeMarsh*, 360 F.Supp. 132, 137 (E.D.Wis.1973) (blacklighting of arrested suspect not a search under Fourth Amendment); *United States v. Millen*, 338 F.Supp. 747, 753 (E.D.Wis.1972) (blacklighting of person in custody not a search); *but see United States v. Kenaan*, 496 F.2d 181, 182–83 (1st Cir.1974) (blacklighting the kind of governmental intrusion into privacy regulated by Fourth Amendment). The most careful analysis of the question is provided in LaFave, *Search and Seizure*, § 2.2, pp. 264–70 (1980). This difficult conceptual question need not be resolved here because, even assuming it was a search, under all the circumstances, the December 7, 1981 blacklighting was reasonable and therefore did not violate Gibson's Fourth Amendment rights.[10]

In *Biehunik v. Felicetta*, 441 F.2d 228, 230 (2nd Cir.), *cert. denied*, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971), the Second Circuit, facing essentially the same type of case we face here, upheld a police department's warrantless "seizure" of its officers upon less than probable cause, as reasonable, and thus non-violative of the Fourth Amendment. *See also United States v. Collins*, 349 F.2d 863, 867–68 (2nd Cir.1965), *cert. denied*, 383 U.S. 960, 86 S.Ct. 1228, 16 L.Ed.2d 303 (1966).

In *Biehunik*, the police commissioner ordered 62 officers, under threat of discharge, to appear in a lineup for possible identification by citizens claiming they had been assaulted by city patrolmen. All 62 officers had been on duty in the general area the night of the incident. The commissioner ordered the lineup, without probable cause to believe any specific officer was involved, because the department had no up-to-date photographs of the officers for the complainants to examine and positively identify. The lineup presented the risk of criminal prosecution as well as administrative sanctions.

In upholding the order, the court articulated the following test: "whether upon a balance of public and individual interests, the order … was reasonable under the particular circumstances, even though unsupported by probable cause."[11] 441 F.2d at 230. In *Biehunik* "the substantial public interest in ensuring the appearance and actuality of police integrity" outweighed the infringement on the officers' personal privacy. *Id.* at 230, 231.

Just as in *Biehunik*, the balance here weighs in favor of the police department. On December 7, 1981, IAD needed to determine immediately whether any of the officers who appeared at the sting site along with Venegas and Myers had stolen the chemically-dusted money. Gibson admitted that he had entered the store and seen the money. Investigators here, like the investigators in *Biehunik*, knew *someone* had stolen the money, but did not know which

---

**10.** Even if blacklighting were not considered a search, investigators did conduct a search by telling Gibson to take his wallet out of his pocket in order for them to blacklight it and the money inside it. Defendants' Exh. 78, pp. 29–30. Moreover, the order to blacklight may well have constituted a seizure of the officers for the purpose of blacklighting them. In any case, as explained below, the whole blacklighting process was reasonable.

**11.** While *Biehunik* involved a seizure, rather than a search, the same reasonableness test should apply in both cases to an employer's job-related intrusion into his employee's privacy. In fact, *Biehunik* relies on search, rather than seizure, caselaw to justify the application of the balancing test to its facts. Moreover, the blacklight search was basically no more intrusive than the seizure in *Biehunik*, and in both cases the procedure occurred "at a time and place that were well within the usual demands of a policeman's job." 441 F.2d at 231.

particular officers were involved. The state, as both employer and law enforcer, had an overwhelming interest in protecting the appearance and actuality of police integrity. Only by blacklighting the uniforms, hands, and wallets of the officers who appeared at the sting site could IAD determine which officers had been involved in a criminal violation of duty. The same practical necessity motivating the lineup in *Biehunik* justified the blacklighting here. Investigators could not have gotten a search warrant here because they had no probable cause to suspect any particular officer in the group. Moreover, investigators needed to act quickly because the guilty officers could wash their hands and destroy the evanescent evidence. In such a case a limited blacklighting search is permissible. *See* LaFave, *Search and Seizure*, § 2.2, p. 270 (1980).

Gibson's interest in not being blacklighted, while significant, simply does not reach the magnitude of the state's interest. As the court said in *Biehunik*:

> ... [P]olicemen, who voluntarily accept the unique status of watchman of the social order, may not reasonably expect the same freedom from governmental restraints which are designed to ensure his fitness for office as from similar governmental actions not so designed. The policeman's employment relationship by its nature implies that in certain aspects of his affairs, he does not have the full privacy and liberty from police officials that he would otherwise enjoy. So long as the actions of a policeman's superior remain within reasonable bounds, there can hardly be that affront to expectations of personal autonomy which marks the state's coercive power in the typical arrest case.

441 F.2d at 231.

██ Under all the circumstances, the blacklighting was reasonable and did not violate Gibson's Fourth Amendment rights.

**B. *January 20, 1982 Searches***

Gibson admits that he consented to the January 20, 1982 searches of his pick-up truck, police locker, home, and garage in order to clear himself of any wrongdoing. Defendants' Exh. 86, Att. 3; Defendants' Exh. 201, pp. 16–17; 27–28; Declaration of Elayne Yochem, July 7, 1982, Exh. A, p. 38.

Under all the circumstances, the consent was voluntarily given. See discussion of consent with respect to search of Gibson's personal car, *supra*. Gibson's deposition testimony demonstrates that he was not coerced or intimidated by IAD investigators. See Defendants' Exh. 201, pp. 27–33.

Plaintiffs also complain that investigators illegally seized power tools from Gibson's truck during the January 20, 1982 search. Investigators took the tools because they had information from Venegas and Myers that Gibson had stolen power tools during a burglary. Defendants' Exh. 112, pp. 2–3; see Defendants' Exh. 92, p. 2. Investigators examined the tools to determine whether they matched the description of the stolen tools and returned them the same day. Defendants' Exh. 93, pp. 3–4.

██ The tool seizure did not violate the Fourth Amendment. As discussed above, Gibson voluntarily consented to the search of his truck. He did so after being advised of the investigators' intent to find possibly stolen tools. Defendants' Exh. 112, p. 3; Defendants' Exh. 93, p. 3. Investigators properly seized the tools in plain view during the course of the consent search. *United States v. Cornejo*, 598 F.2d 554, 556 (9th Cir.1979).

██ The Gibson family suffered no deprivation of Fourth Amendment rights when investigators searched Gibson's home and garage on January 20, 1982. Roger Gibson consented to the search. He was the only family member home. He did not tell the officers that his family would object to the search, and the officers did not search any place Gibson did not want them to look. Defendants' Exh. 201, pp. 28–33. Also, it must be remembered that Gibson consented to a search for evidence of crime *by himself, not by a member of his family*. Although he may not have had actual authority to consent to the search of certain

parts of his home, investigators reasonably believed that he had such authority, and therefore the search did not violate the Gibson family's Fourth Amendment rights. *United States v. Sledge,* 650 F.2d 1075, 1080–81 (9th Cir.1981); *see also United States v. Lopez-Diaz,* 630 F.2d 661, 666–67 (9th Cir.1980).

None of the January 20, 1982 [12] searches violated any of the plaintiffs' Fourth Amendment rights. Summary judgment is granted to the defendants with respect to those searches.

## C. *April 15, 1982 Administrative Order to Search*

The parties agree that the April 15 order presents no triable issues of fact, and should be decided by summary judgment. While the balancing test articulated in *Biehunik,* and applied above to the blacklighting search, still provides the method of analysis, the scale here tips in favor of Gibson.

On April 15, IAD wanted to search Gibson's garage and private vehicles to determine whether he possessed a battery he allegedly stole in an on-duty burglary on August 17, 1981. It seems highly unlikely that eight months after the burglary, Gibson, fully aware of IAD suspicion, would not have disposed of the battery. In fact, defendants concede that the great passage of time prevented them from seeking a warrant. Unlike the order in *Biehunik* and the blacklighting order in this case, the April 15 order was not a highly reliable method of determining whether a particular officer had violated departmental regulations and criminal laws. Also unlike *Biehunik,* the IAD here did not know with substantial certainty that an officer had committed a crime. See Defendants' Exh. 91, pp. 4–5. Plainly, the department's interest in conducting the desired search on April 15 was not particularly strong.

On the other hand, Gibson's interest in refusing to allow the search was much greater than the officers' interest in *Bie-*

*hunik.* IAD sought to search his garage and his private cars at home. That search would have been much more intrusive than the seizure in *Biehunik* or the blacklight search on December 7, 1981. Moreover, the search definitely would not have been "conducted at a time and place that were well within the usual demands of a policeman's job." 441 F.2d at 231.

▇ Under all the circumstances, the April 15, 1982 order to search was not reasonable and therefore Gibson could not lawfully be disciplined for refusing to obey it. Appropriate relief will be determined later. LAPPL's request for relief is denied. Each case must be determined by balancing the particular factors present. Under appropriate circumstances, a warrantless search of an officer's private property may be reasonable.

## IV.

## FIFTH AMENDMENT CLAIMS

Before giving Gibson his *Miranda* warnings, defendants interviewed him on December 7, 28, and 30, 1981. IAD read Gibson his *Miranda* rights during an interview on January 20, 1982, and then interviewed him again on April 5, April 15, and May 19, 1982.

Plaintiffs apparently argue that defendants violated Gibson's Fifth Amendment rights because (1) IAD initially interrogated him in custody without *Miranda* warnings in what was actually a criminal investigation; (2) even after Gibson received and refused to waive his *Miranda* rights, IAD asked him questions not specifically, directly, and narrowly related to his fitness as an officer; (3) IAD had no authority to grant immunity, and thus Gibson did not have adequate protection against self-incrimination; (4) IAD's dual-track investigatory system is unconstitutional because statements and fruits from the ostensibly "administrative" part of the investigation are presented to the district attorney for prose-

---

**12.** The January 20 searches involved the only possible § 1983 claim by Gibson's family. No other alleged misbehavior by LAPD could have violated their personal rights.

cutorial purposes; and (5) defendants did not properly advise Gibson of his options as required by *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

■ Plaintiffs' arguments are meritless. With respect to the interviews before Gibson received *Miranda* warnings on January 2, 1982, the Fifth Amendment never came into play. The district attorney never prosecuted Gibson and Gibson never refused to answer questions before January 20, 1982. Moreover, none of the administrative charges brought against him related to the interviews before January 20, 1982. See Defendants' Amended Exhibit 83, Att. 13.

■ With respect to the interviews occurring on and after January 20, 1982, defendants did not violate Gibson's Fifth Amendment rights. On January 20, 1982 IAD gave Gibson *Miranda* warnings. Investigators made clear that nothing Gibson said could be used in any criminal investigation or prosecution of him, but that if he insisted on remaining silent he could be fired. Declaration of Elayne Yochem, July 7, 1982, Exh. A, p. 4. Gibson perfectly understood his options under *Garrity*. IAD followed the procedure explicitly approved in *Gardner v. Broderick*, 392 U.S. 273, 278, 88 S.Ct. 1913, 1916, 20 L.Ed.2d 1082 (1968) (dictum); *Lefkowitz v. Turley*, 414 U.S. 70, 84, 94 S.Ct. 316, 325, 38 L.Ed.2d 274 (1973); and *Uniformed S.M. Ass'n Inc. v. Commissioner of S. of N.Y.*, 426 F.2d 619, 626 (2nd Cir.1970), *cert. denied*, 406 U.S. 961, 92 S.Ct. 2055, 32 L.Ed.2d 349 (1972). See Declaration of Elayne Yochem, July 7, 1982, Exh. A, p. 4. Even had IAD not followed the correct procedure, Gibson would have no complaint under *Garrity* because the Board of Rights disciplined him only for giving false answers, not for refusing to answer at all.

Plaintiff misses the mark by complaining that IAD had no statutory authority to grant immunity. As the court said in *Confederation of Police v. Conlisk*, 489 F.2d 891, 895 n. 4 (7th Cir.1973), *cert. denied, sub nom. Rochford v. Confederation of Police*, 416 U.S. 956, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974):

In *Garrity*, the Supreme Court indicated that the Fifth Amendment *itself* prohibited the use of statements or their fruits where the statements had been made under the threat of dismissal from public office. Therefore, by advising the officers that their statements, when given under threat of discharge, cannot be used against them in subsequent criminal proceedings, the IAD is not "granting" immunity from prosecution; it is merely advising the officers of the constitutional limitations on any criminal prosecution should they answer. *Uniformed Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation*, 426 F.2d 619, 627 (2nd Cir.1970), *cert. denied*, 406 U.S. 961 [92 S.Ct. 2055, 32 L.Ed.2d 349] (1972).

■ Plaintiffs fail to identify a single question not directly, narrowly, and specifically related to Gibson's fitness as a police officer. A review of the Board of Rights Rationale on Findings & Penalty, Defendants' Amended Exh. 83, Att. 13, demonstrates the wide scope of the job-related administrative charges against him. IAD's interrogations directly and narrowly related to the facts surrounding those charges. In any case, Gibson cannot complain that he was penalized for failing to answer questions not directly and narrowly concerning his fitness as an officer. He never faced criminal charges of any type and the Board of Rights disciplined him only for falsely answering questions which did directly and specifically concern his fitness as an officer.

■ Plaintiffs also cannot complain that the dual-track investigation process results in the prosecutorial use of evidence obtained in a compelled administrative interview. Gibson never faced any criminal prosecution. The dual-track process did not affect him.

Defendants did not violate plaintiffs' Fifth Amendment rights. Summary judgment on this issue is granted to defendants.

CONCLUSION

Summary judgment is granted to defendants on plaintiffs' First, Fifth, and Sixth Amendment claims. Summary judgment is also granted to defendants on all Fourth Amendment claims except the April 15, 1982 administrative order to search. That order was unreasonable and summary judgment on that issue is granted to plaintiffs.