803 F.2d 485
 55 USLW 2298
 Gary KIRKPATRICK and Eric R. Hermann, Plaintiffs-Appellants,
v.
The CITY OF LOS ANGELES, Daryl F. Gates, Chief of Police,
and Lt. John Aggas, individually and in their
official capacity, Defendants-Appellees.
 No. 85-6289.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 7, 1986.
Decided Oct. 24, 1986.
 
 Peter J. Ferguson (argued), Larry J. Roberts, Petersen & Ferguson, Santa Ana, Cal., for plaintiffs-appellants.
 Robert Cramer, Asst. City Atty., Los Angeles, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before SCHROEDER and HALL, Circuit Judges, and HARDY,* District Judge.
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 Plaintiffs-appellants, Gary Kirkpatrick and Eric R. Hermann, former Los Angeles police officers ("the officers"), appeal from the district court's grant of summary judgment in favor of defendants-appellees, the City of Los Angeles, Chief of Police Daryl F. Gates, and Lieutenant John Aggas.
 
 
 2
 * On March 13, 1981, while performing their regular duties for the Los Angeles Police Department, the officers responded to a radio call regarding a disturbance at the scene of an automobile accident. At the scene they encountered Robert Rusk, who was intoxicated and had sustained a minor injury. The officers arrested Rusk because a computer check revealed that he was wanted on an outstanding misdemeanor arrest warrant. Before booking him, however, the officers took Rusk to a nearby hospital for medical treatment.
 
 
 3
 While at the hospital, Rusk told the attending physician that the officers had taken over $600 from him. Immediately after Rusk made this accusation, Kirkpatrick summoned Sergeant Johnson, one of the officers' supervisors who happened to be at the hospital. Johnson interviewed Rusk. During this interview, Rusk equivocated about the accusation and the amount of money allegedly stolen by the officers, eventually reducing the amount from $600 to $60.[1] Johnson searched the patrol vehicle and each officer's pockets, wallet, and weapon belt at the hospital, but failed to discover any evidence of wrongdoing. Neither officer had over five dollars in his possession.
 
 
 4
 Upon arriving at the station, Johnson told Lieutenant Aggas, the watch commander, about Rusk's accusation and the extent and results of Johnson's investigation. Aggas ordered Johnson to strip search the officers. Johnson stated that in his opinion the strip searches were unnecessary, but Aggas directed him to perform the searches in order to protect the officers' records and the department's credibility.
 
 
 5
 The officers objected to the proposed strip searches. Aggas telephoned the Internal Affairs Division of the department and spoke to Lieutenant Peter Borgerding, the department "advocate." Borgerding recommended that Aggas obtain the officers' consent to the strip searches if possible. However, Borgerding also told Aggas that he had the power to order the searches even without the officers' consent. Both sides agree that as of March 13, 1981, the department had no written policy regarding strip searches of department employees accused of theft or other misconduct.
 
 
 6
 Aggas directed Johnson to perform the searches without the officers' consent. The searches were performed behind a row of lockers in the corner of the station's locker room, outside the presence of other persons. Because of their familiarity with the search procedure each officer removed his own clothing and handed each article to Johnson for inspection without verbal direction or physical contact. Hermann did not remove his undershorts. Kirkpatrick voluntarily lowered his undershorts, bent over, and spread his buttocks with his hands.
 
 
 7
 On July 20, 1983, the officers sued the defendants for damages pursuant to 42 U.S.C. Sec. 1983, alleging that the searches violated their fourth amendment and fourteenth amendment rights. The parties filed cross-motions for summary judgment. The district court ordered summary judgment in favor of the defendants, concluding that the searches were reasonable and thus did not violate the officers' fourth amendment rights.
 
 II
 
 8
 We have jurisdiction over the officers' timely appeal pursuant to 28 U.S.C. Sec. 1291. We review the district court's grant of summary judgment de novo. Allen v. A.H. Robins Co., 752 F.2d 1365, 1368 (9th Cir.1985). Summary judgment is appropriate when, viewing the evidence in the light most favorable to the party opposing summary judgment, "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Lojek v. Thomas, 716 F.2d 675, 677 (9th Cir.1983).
 
 III
 
 9
 We conclude that the district court erred in holding that the searches at issue did not violate the officers' fourth amendment rights.
 
 
 10
 * The fourth amendment prohibits unreasonable searches and seizures. Bell v. Wolfish, 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). The general inquiry for determining reasonableness was outlined by the Supreme Court in Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).
 
 
 11
 [T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against "an objective standard," whether this be probable cause or a less stringent test. In those situations in which the balance of interests precludes insistence upon "some quantum of individualized suspicion," other safeguards are generally relied upon....
 
 
 12
 Id. at 654-55, 99 S.Ct. at 1882-83 (footnotes omitted). Defendants argue that the government's interest in the integrity of its police force is sufficient to justify the search of the officers even absent some "quantum of individualized suspicion" to support the search. We hold that, in spite of the government's interest in police integrity, strip searches of police officers for investigative purposes[2] must be supported by a reasonable suspicion that evidence will be uncovered.
 
 
 13
 Although police officers "are not relegated to a watered-down version of constitutional rights," Garrity v. New Jersey, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967), the government has an interest in police integrity which must be considered in evaluating the reasonableness of investigative searches of police officers. For example, in Biehunik v. Felicetta, 441 F.2d 228 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971), the Second Circuit upheld a procedure in which sixty-two police officers were forced to appear in a lineup for purposes of identification by persons who claimed they were assaulted by a police officer. The officers were chosen for the lineup because they had been on duty in the area where the alleged assault occurred. The court found that the lineup was reasonable even though there was no probable cause to believe that any particular officer committed the alleged assault. 441 F.2d at 230.
 
 
 14
 Decisive to our conclusion that the lineup was indeed "reasonable" is the substantial public interest in ensuring the appearance and actuality of police integrity. We do not believe that the public must tolerate failure by responsible officials to seek out, identify, and appropriately discipline policemen responsible for brutal or unlawful behavior in the line of duty, merely because measures appropriate to those ends would be improper if they were directed solely toward the objective of criminal prosecution. A trustworthy police force is a precondition of minimal social stability in our imperfect society....
 
 
 15
 Id. at 230-31. See also Los Angeles Police Protective League v. Gates, 579 F.Supp. 36, 45-46 (C.D.Cal.1984) (upholding the blacklighting of officer's hands, uniform, and wallet absent probable cause or consent, because of government's interest in police integrity).
 
 
 16
 Balanced against the government's interest in the integrity of its police force is the officers' interest in not being subjected to highly intrusive searches of their person. The item by item search of personal clothing down to the officers' skin or underwear is far more intrusive than the lineup upheld in Biehunik or the blacklighting approved in Gates.
 
 
 17
 Strip search cases concerning prisoners, prison guards, and prison visitors provide a meaningful parallel for our analysis of investigative strip searches of police officers. There is no question that the government has an interest in the security of its prisons which will justify searches in the prison context which would not otherwise be reasonable. See Bell, 441 U.S. at 559, 99 S.Ct. at 1884 (upholding visual body cavity search of prisoners after contact visits with persons outside the prison). However, because of the highly intrusive nature of a strip search, courts have found that the fourth amendment requires that strip searches in the prison context be supported by a reasonable suspicion that evidence will be uncovered. In Giles v. Ackerman, 746 F.2d 614 (9th Cir.1984), cert. denied, 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985), we balanced a county jail's interest in security against the privacy interests of persons arrested for minor offenses. We concluded that, because the security interests of the county jail were less extensive than the security interests of the maximum security prison at issue in Bell, strip searches of persons arrested for minor offenses must be supported by "a reasonable suspicion that the individual arrestee is carrying or concealing contraband." Id. at 617.
 
 
 18
 Other courts have reached similar conclusions. In Security and Law Enforcement Employees, District Council 82 v. Carey, 737 F.2d 187, 192 (2d Cir.1984), the court held that strip searches of correctional employees must be supported by a reasonable suspicion. The court recognized the government's interest in protecting the safety of inmates and correctional personnel, but still held that strip searches must be supported by a reasonable suspicion because of the intrusiveness of the search. Id. at 204. See also Hunter v. Auger, 672 F.2d 668, 674 (8th Cir.1982) (applying reasonable suspicion standard for strip searches of prison visitors); McDonnell v. Hunter, 612 F.Supp. 1122, 1128-29 (S.D.Iowa 1985) (imposing reasonable suspicion standard for strip searches of correctional employees).
 
 
 19
 Strip search cases at the international border are also instructive. The government has an interest in preventing the entry of contraband into the country which justifies some searches at the border that would not otherwise be constitutional. See United States v. Montoya de Hernandez, --- U.S. ----, 105 S.Ct. 3304, 3309-10, 87 L.Ed.2d 381 (1985). Nonetheless, because of the intrusive nature of a strip search, we have required that strip searches at the border be supported by a "real suspicion" that contraband will be uncovered. See United States v. Handy, 788 F.2d 1419, 1420-21 (9th Cir.1986); United States v. Rodriguez, 592 F.2d 553, 556 (9th Cir.1979).[3]
 
 
 20
 The same type of analysis applies here. The government has an interest in the integrity of its police force which may justify some intrusions on the privacy of police officers which the fourth amendment would not otherwise tolerate. However, because of their highly intrusive nature, investigative strip searches of police officers must be supported by a reasonable suspicion that evidence will be found, despite the government's interest in police integrity. Cf. Gates, 579 F.Supp. at 47 (finding search of an officer's private car and garage which was not supported by probable cause unreasonable in part because this search was more intrusive than lineup in Biehunik or blacklighting approved in Gates ).
 
 
 21
 In concluding that the searches did not violate the officers' fourth amendment rights, the district court overemphasized the reasonable manner in which the searches were conducted. Although reasonableness in the conduct of the search is a consideration, see Bell, 441 U.S. at 560, 99 S.Ct. at 1885, the fact that a strip search is conducted reasonably, without touching and outside the view of all persons other than the party performing the search, does not negate the fact that a strip search is a significant intrusion on the person searched, see Giles, 746 F.2d at 617. We conclude that strip searches of police officers for investigative purposes are governed by the reasonable suspicion standard even when they are conducted in a courteous manner with the minimum invasion of privacy possible.
 
 B
 
 22
 Aggas had no reasonable suspicion that the officers had money taken from Rusk on their person. A reasonable suspicion exists when the person responsible for the search is aware of specific articulable facts, and inferences from those facts, which reasonably warrant a suspicion that evidence will be uncovered. See Security and Law Enforcement Employees, 737 F.2d at 205; Hunter, 672 F.2d at 674. See also United States v. Most, 789 F.2d 1411, 1415 (9th Cir.1986) (discussing reasonable suspicion standard). There are no facts indicating that money would be found on the officers.[4] Rusk's accusation varied from $600 to $60 allegedly taken by the officers, and then Rusk refused to repeat the allegation when questioned by Sergeant Johnson. The preliminary investigation including the search of the officers' pockets and gunbelts, revealed nothing, and Sergeant Johnson reported that there was no reason to believe Rusk's accusation. Under these circumstances the strip searches conducted at the station violated the officers' fourth amendment rights.
 
 IV
 
 23
 Our conclusion that the searches violated the officers' fourth amendment rights does not end our inquiry. Because the officers seek monetary relief from the city of Los Angeles and city employees Gates and Aggas, this appeal also presents questions of qualified individual immunity and municipal liability.
 
 
 24
 * Public servants performing discretionary tasks are immune from individual liability if their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity protects the public official and society from expending resources inappropriately. "[S]ocial costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." Id. at 814, 102 S.Ct. at 2736.
 
 
 25
 The Harlow clearly-established-right standard is an objective inquiry. See Ward v. County of San Diego, 791 F.2d 1329, 1332 (9th Cir.1986). We start by examining precedent from this court and the Supreme Court to determine if the right was clearly established at the time of Gates' and Aggas' actions. In the absence of binding precedent from this court or the Supreme Court, we look to decisions from other courts to determine if the right was clearly established. Id.; Capoeman v. Reed, 754 F.2d 1512, 1514 (9th Cir.1985). If we are required to examine decisions from other courts, the likelihood that this court or the Supreme Court would adopt the analysis of the other courts is also part of our inquiry into whether the right was clearly established. Ward, 791 F.2d at 1332; Capoeman, 754 F.2d at 1515.
 
 
 26
 The officers admit that there were no decisions regarding investigative strip searches of police officers or correctional officers by any court when they were searched in 1981. They contend, however, that other fourth amendment decisions pre-dating the search clearly established that an investigative strip search could not be conducted without some suspicion that evidence would be uncovered. We disagree. In 1971 the Biehunik decision of the Second Circuit recognized that police officers may be subjected to certain searches or seizures in the interest of protecting police integrity which would not otherwise be tolerated by the fourth amendment. 441 F.2d at 230. In 1979 the Supreme Court relied on the government's interest in prison security to hold that visual body cavity searches of prisoners conducted after contact visits by prisoners in a maximum security facility were constitutional, without requiring any degree of suspicion that a particular prisoner was taking contraband back into the prison population. Bell, 441 U.S. at 560, 99 S.Ct. at 1885. On the other hand this court had held that strip searches for persons entering the country must be supported by a real suspicion, United States v. Guadalupe-Garza, 421 F.2d 876, 879 (9th Cir.1970), and neither students or persons arrested for minor offenses could be subjected to strip searches absent some degree of suspicion. Bilbrey v. Brown, 738 F.2d 1462, 1466 (9th Cir.1984) (students); Ward, 791 F.2d at 1333 (minor offense arrestees).
 
 
 27
 Applying the Harlow analysis to these precedents we conclude that the officers' right not to be subjected to strip searches absent some quantum of suspicion was not clearly established at the time of the searches. In 1981 it was unclear whether this court would apply the interest in police integrity found in Biehunik to permit investigative strip searches of police officers absent any suspicion in the same manner that the Supreme Court applied the interest in prison security to justify strip searches after contact visits absent any suspicion in Bell, or require some degree of suspicion to support the search. Today we conclude that a reasonable suspicion is required to support strip searches of police officers for investigative purposes because of the intrusive nature of such searches. But Gates and Aggas are not personally liable for failing to reach the same conclusion in 1981.[5]
 
 B
 
 28
 The city argues that, even if the searches violated the fourth amendment rights of the officers, the city is not liable for the violation because the officers have not shown a causal connection between the city policy that strip searches be conducted in a reasonable manner and the violation of the fourth amendment in this case. Because we find that there are questions of fact regarding the city's liability we remand for further consideration by the district court.
 
 
 29
 Under Monell v. Department of Social Services, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), a municipality is not liable for damages under section 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort." See also Pembaur v. City of Cincinnati, --- U.S. ----, 106 S.Ct. 1292, 1297, 89 L.Ed.2d 452 (1986). In this case both sides agree that the city had no written policy regarding investigative strip searches of its officers, but that the following statement from Gates' declaration represents the unwritten policy of the Los Angeles Police Department at the time of the search.
 
 
 30
 [W]hen an accusation of misconduct which would constitute a criminal offense and may properly be the subject of discipline is made, it shall be thoroughly investigated.... [T]he investigation may, in the discretion of appropriate supervisory personnel, include a search of the person of the concerned employee when such action is warranted. It is the policy of this department that a search of the person is warranted only when it is reasonable to do so. In this regard, reasonableness requires consideration of the totality of the circumstances, including but not limited to, the seriousness of the misconduct if proved, the scope of the search contemplated, and the method to be employed in carrying out the search. In all cases an effort to obtain consent for a search is required.
 
 
 31
 The parties do not question Gates' authority to make policy on behalf of the city, or that the above statement represents official policy. The question is whether this municipal policy caused the constitutional deprivation.
 
 
 32
 In City of Oklahoma City v. Tuttle, the Supreme Court set forth an inquiry for determining whether the necessary causal relationship between policy and constitutional deprivation is present in a given case:
 
 
 33
 Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributable to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.
 
 
 34
 471 U.S. 808, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (footnotes omitted). See also Kelson v. City of Springfield, 767 F.2d 651, 656 (9th Cir.1985) (applying Tuttle ).
 
 
 35
 Tuttle breaks the causation analysis under Monell into two distinct inquiries. When the municipal policy is unconstitutional on its face because it precludes consideration of the relevant constitutional factor, such as the health of the pregnant employee in Monell, then the causal relationship between the municipal policy and the constitutional tort is evident even if only one constitutional tort is proved. When, however, the municipal policy simply admonishes municipal employees to act reasonably in considering a range of factors, the connection between the municipal policy and the constitutional deprivation is not clear. When the latter type of municipal policy exists a section 1983 claimant must provide "considerably more proof than the single incident ... to establish both the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation."
 
 
 36
 In this case the municipal policy as stated in Gates declaration is not unconstitutional on its face. The policy permits consideration of all circumstances surrounding an accusation against an officer before a strip search is conducted, and condones such searches only when they are reasonable. In contrast to the municipal policy in Monell which conflicted with the holding of Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), by requiring pregnant employees to take sick leave before it was necessary for medical reasons, following the city's strip search policy would not necessarily lead to a violation of fourth amendment rights in any case.
 
 
 37
 Because the city's policy of conducting strip searches when reasonable is not unconstitutional on its face, the officers must show that the city's policy resulted in a pattern of constitutional deprivations, Tuttle, 105 S.Ct. at 2436, including the deprivation of their fourth amendment rights, City of Los Angeles v. Heller, --- U.S. ----, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986), in order to recover from the city under section 1983. The officers' complaint contains the bare allegation that the strip search in this case was conducted "pursuant to policy or procedure of the Los Angeles Police Department." The complaint contains no allegations that the strip search of the officers was one in a series of unconstitutional searches resulting from what would on its face be a constitutional city policy. The record before us, however, contains evidence that other investigative strip searches have been conducted by the department under the existing policy. If the officers can establish that these searches resulted from the city's policy and were conducted without reasonable suspicion to believe that evidence would be uncovered, then the officers could establish the necessary causal relationship between city policy and a pattern of constitutional torts. Under these circumstances we conclude that the officers should be permitted an opportunity to amend their complaint to add allegations regarding a pattern of constitutional deprivations, and the causal relationship between the city policy and the constitutional tort against the officers. See Kelson, 767 F.2d at 656.
 
 V
 
 38
 The decision of the district court granting summary judgment is REVERSED. This action is REMANDED to the district court with instructions to dismiss the claims against Gates and Aggas in their individual capacity, and to permit plaintiffs leave to amend. Each side shall bear its own costs on appeal.
 
 
 
 *
 Honorable Charles L. Hardy, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 Kirkpatrick tape-recorded this statement and all other conversations involving Rusk at the hospital. The following is an excerpt from Johnson's interview with Rusk:
 SERGEANT: What's this about the $600?
 RUSK: No, I'd just like to make a phone call, that's all.
 SERGEANT: Nobody took $600?
 RUSK: No. No one took $600, okay? I'd just like to make a phone call. I have a few hundred dollars in my pocket. I'd like to make sure that you count it and make sure that it stays there, you understand?
 * * *
 SERGEANT: When I first came in here you said the officers stole $600 from you.
 RUSK: Well, let me put it this way, $60, okay?
 SERGEANT: Okay, now they stole $60--
 RUSK: No, no, you're putting words in my mouth.
 SERGEANT: When I walked in here you told me that the officers stole $600 from you.
 RUSK: I didn't say nothing.
 SERGEANT: Now you say you started out with $290.
 RUSK: What I said was I had less money than I had when I came in here.
 * * *
 SERGEANT: Tell me again how much money these officers stole.
 RUSK: I'm not saying they stole anything, I just said I want to talk to my lawyer and I want to go home, okay?
 SERGEANT: Did they steal money or didn't they steal money?
 RUSK: I don't know, did they steal money?
 SERGEANT: You're the one that's making the allegation.
 RUSK: Yeah, I had more money than I have there, okay?
 
 
 [2]
 This case does not present the question of whether evidence uncovered in an investigative search without a warrant or probable cause would later be admissible against an officer in a criminal proceeding
 
 
 [3]
 The Supreme Court's statement in Montoya de Hernandez that "the Fourth Amendment's emphasis upon reasonableness is [not] consistent with the creation of a third verbal standard in addition to 'reasonable suspicion' and 'probable cause,' " Montoya de Hernandez, 105 S.Ct. at 3311, sheds considerable doubt on our use of the "real suspicion" standard in border strip search cases, but the court did not decide the question of what standard should be applied to strip searches at the border, id. at 3311 n. 4, and we do not address that question today
 
 
 [4]
 The parties agree on the facts underlying Rusk's accusation, the investigation of Rusk's accusation, and the nature of the search, so there are no questions of fact regarding the circumstances of the search or the basis for suspecting the officers
 
 
 [5]
 Because we find that Gates and Aggas are immune from personal liability, we do not address Gates' assertion that he is not liable because he did not personally participate in the decision to search the officers. See Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985)