SECURITY AND LAW ENFORCEMENT EMPLOYEES, DISTRICT COUNCIL 82, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL–CIO, by its Treasurer William CLAY, Richard Bischert, William Lothrop, Robert Morse, George Frees, Thomas F. Lynch, Richard J. Schrade, David L. Bowser, Charles E. Gordon, Jr., Melvin L. Bullock, Benjamin Whaley and Squire Simpson, individually and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

Hugh CAREY, as Governor of the State of New York, Thomas A. Coughlin, III, as Commissioner of the New York Department of Correctional Services, Walter Fogg, individually and as Superintendent of Eastern Correctional Facility, Robert Kuhlmann, individually and as Superintendent of Woodbourne Correctional Facility, Dominick Mantello, individually and as Deputy Superintendent of Woodbourne Correctional Facility and Henry DeLuca, individually and as Deputy Superintendent for Security at Arthur Kill Correctional Facility, Defendants-Appellees.

No. 1418, Docket 83–7147.

United States Court of Appeals, Second Circuit.

Argued June 15, 1983.

Decided June 8, 1984.

As Amended July 24, 1984.

---

Van Graafeiland, Circuit Judge, filed opinion concurring in part and dissenting in part.

Brian J. O'Donnell, Albany, N.Y. (Rowley, Forrest & O'Donnell, P.C., Albany, N.Y.), for plaintiffs-appellants.

Robert A. Forte, Asst. Atty. for the State of N.Y., New York City (Robert Abrams, Atty. Gen. for the State of N.Y., Judith A. Gordon, Asst. Atty. Gen. for the State of N.Y., of counsel, New York City, Melvyn R. Leventhal, Deputy First Asst. Atty. Gen. for the State of N.Y., New York City), for defendants-appellees.

Before VAN GRAAFEILAND, PIERCE and WISDOM,* Circuit Judges.

PIERCE, Circuit Judge:

Plaintiffs appeal from a final judgment of the United States District Court for the Southern District of New York, Robert Carter, *Judge,* entered January 31, 1983, dismissing plaintiffs' complaint seeking declaratory, injunctive and monetary relief for alleged deprivations of rights, privileges and immunities guaranteed by the fourth and fourteenth amendments of the United States Constitution and 42 U.S.C. § 1983 (Supp. V 1981).[1]

### I. INTRODUCTION

It is axiomatic that, as long as convicted persons are imprisoned, guards will be required to maintain security in the institutions to which the prisoners are sentenced. It is not unexpected or surprising that some of these guards or correction officers breach security by smuggling contraband into correctional facilities. Once contraband, including drugs, money, weapons, and myriad other items, is introduced into the prison environment, the order and routine that must be maintained to achieve stability and security in these facilities is apt to be undermined and disrupted. The consequence obviously can place the lives

---

\* Senior Judge of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. Section 1983 reads in pertinent part:
    Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
    42 U.S.C. § 1983 (Supp. V 1981).

and well-being of both staff and inmates in serious jeopardy. So, since guards must guard inmates, it is not rhetorical to ask, "who are to guard the guards?"[2]

We are confronted herein with two specific types of warrantless disrobe searches of guards for contraband.[3] The district court used the term "strip search" in referring to an inspection of the naked body of the person searched and we will continue to use the term in that sense. The district court used the term "strip frisk search" to describe a search including a visual examination of the anal and genital areas of the person searched. We will refer to this latter type of inspection as a "visual body-cavity search" rather than a "strip frisk search" since this latter terminology tends to evoke images of touching, probing or physically intruding into the body. It is important for analytical purposes to note that none of the searches of the correction officers herein involved any touches, probes or other bodily intrusions.[4]

Contrary to the district court's analysis, which established two categories of searches and hinted at another, there are three aspects of the New York State Department of Correctional Services' ("Department") search procedures that must come under constitutional scrutiny: (1) the strip searches; (2) the visual body-cavity searches; and (3) the random-search policy, which includes both strip searches and visual body-cavity searches of correction officers not suspected of bringing contraband into correctional facilities. We hold: (1) that a reasonable suspicion standard governs strip searches of correction officers and that therefore the warrantless strip searches herein did not per se violate the fourth and fourteenth amendment rights of the officers; (2) that the warrantless visual body-cavity searches of correction officers herein were unreasonable and did violate the fourth and fourteenth amendment rights of the officers; (3) that the warrantless searches based on the Department's random-search policy of correction officers not suspected of bringing contraband into the correctional facilities were unreasonable and violated the fourth and fourteenth amendment rights of those officers; and (4) that qualified immunity from liability for damages is available to those correction officials who ordered certain unreasonable strip searches, the visual body-cavity searches and the searches based on the Department's random-search policy.

2. Decimus Junius Juvenal originally stated: "Sed quis custodiet ipsos Custodes?" (But who is to guard the guards themselves?).

3. Most of the facts described herein have been stipulated to by the parties. One of the stipulations included the following definition of "strip frisk":

A strip frisk is a procedure in which a person being frisked is required to empty his pockets and remove all of his clothing. The clothing is then searched. The person is then required to run his hands through his hair, open his mouth and remove any dentures. The person is then required to open his hands and spread his fingers and rotate his hands so that both the palms and backs are shown to the person conducting the search. The person then raises his arms to expose his armpits. If the person being searched is male, he is required to skin back his penis and lift his testicles. If the person is female, she is required to squat. In either case the person being searched is then required to turn his back to the person conducting the search, lift his feet to expose their [sic] soles and wiggle his toes. The person being searched is then required to bend forward approximately 90 degrees and spread the cheeks of his buttocks to expose his anus to the person conducting the search. The person is then permitted to redress.

Plaintiff Security and Law Enforcement Employees, District Council 82, American Federation of State, County and Municipal Employees, AFL–CIO, as a preliminary matter, complains in its brief that, apart from this stipulation, the district court made a distinction between searches that involved merely visual examinations of the naked bodies of the persons being searched and searches that required the above-described acts. Council 82 states that it is dissatisfied with this distinction because each of the searches is constitutionally offensive and warrants relief.

4. The December 23, 1977, incident at Fishkill Correctional Facility, discussed *infra*, did involve a pat frisk of one correction officer. Pat frisks, searches of clothing, bags, etc., are not encompassed within this opinion because no issues involving these search procedures were raised in the district court or on this appeal.

## II. BACKGROUND

All persons employed by the Department as correction officers received a booklet in which the following policy statement appeared: "All persons on institution property and any employee while on duty shall be subject to search. Such search shall be supervised by a custodial employee above the rank of correction officer .... Refusal of an employee to submit to a search shall constitute grounds for preferring charges." *New York State Department of Correctional Services Rule Book, Revised 1969* § 4.20 (known as "Rule 4.20"). Each of the employees searched herein received at the commencement of employment a rule book containing this rule or its quite-similar successor, Rule 201.21.

### Coxsackie

On June 6, 1977, John Roe,[5] a correction officer assigned to the Coxsackie Correctional Facility ("Coxsackie"), an institution within the prison system operated by the Department, was scheduled to begin work at 3:00 p.m. At approximately noontime of that day, Correction Captain Anthony Umina, the acting superintendent, received information concerning Officer Roe from a staff person and Correction Officer Vincent.

Vincent and the staff person reported that a Coxsackie inmate had a sexual encounter with Roe on June 5, 1977, and that Roe had agreed to bring the inmate marijuana or wine the following day. Captain Umina, who had known the staff person and Vincent for approximately six months, questioned the staff person about the source of his information. The staff person stated that he had received the information from the inmate, who purportedly had engaged in the sexual encounter with Roe. Based on this information, Umina decided that when Roe reported to work that day he would be searched, and accordingly Umina called the Department's Central Office in Albany and so informed it.

When Roe reported to his assignment, a correction sergeant directed him to report to Umina at the deputy superintendent's office. Roe reported to that office along with two other correction officers who were summoned randomly. When the three officers arrived at the deputy superintendent's office, Sergeant Coons informed them that they would be searched. While Roe was waiting to enter the deputy superintendent's office for the search, Sergeant Coons observed Roe place what appeared to Coons to be a marijuana cigarette on the windowsill of the outer office. It was later determined that the cigarette contained marijuana. At that point, Umina took Roe into the inner office and informed him that he would be searched pursuant to Rule 4.20. Captain Umina ordered Roe to disrobe completely to determine if there was contraband in his clothing or taped to his body. Roe was subjected to a strip search, but was not required to submit to a visual body-cavity search. No additional contraband was found.

### Wallkill

On July 2, 1977, Correction Officer Bill Doe,[6] who was assigned to work at the Department's Wallkill Correctional Facility ("Wallkill"), was searched. Previously, on June 22, 1977, Correction Lieutenant Louis Lorenz received information from an inmate informant that Doe was trafficking in drugs and that Doe, and possibly others, were planning to aid five inmates in an escape planned for August 1977. Lorenz relayed the information to Superintendent William Quick, to the Department's Inspector General's Office and to the New York State Police Bureau of Criminal Investigation. On or about June 24, 1977, the informant delivered marijuana to Lorenz in response to his request to see samples of the drugs allegedly brought into Wallkill by Doe. Also pursuant to a request by Lorenz, on or about June 27, 1977, the informant delivered hashish to him.

---

**5.** The true name of the correction officer involved has been changed for purposes of this opinion.

**6.** *Id.*

On or about June 28, 1977, Lieutenant Lorenz and the inmate met with representatives of the Department's Inspector General's Office and the State Police Bureau of Investigation at the state police barracks at Newburgh, New York. During the meeting, the informant repeated his allegations concerning the escape plan and Doe's drug trafficking. The Department made arrangements to permit the informant to leave Wallkill on a furlough to meet with Doe for the purpose of electronically recording an escape-related conversation between the informant and Doe.

Between June 22 and June 30, 1977, the informant provided Lieutenant Lorenz with additional information, on an almost daily basis, concerning Doe's drug trafficking. On June 30, 1977, the informant was allowed to go on furlough. On or about the morning of July 2, 1977, the informant met with Doe, who agreed to bring hacksaw blades and marijuana into Wallkill on his next tour of duty, which was scheduled to begin at 3:45 p.m. on July 2, 1977.

At approximately 2:00 a.m. on July 2, 1977, a representative of the Inspector General's Office telephoned Lieutenant Lorenz at home and informed him of the informant's report concerning the meeting between the informant and Doe and of Doe's agreement to bring hacksaw blades and marijuana into the facility on July 2, 1977. At approximately 3:00 a.m. on July 2, 1977, Lorenz telephoned Superintendent Quick and relayed the information about Doe. Quick instructed Lorenz to be at Wallkill at 2:00 p.m. on July 2, 1977.

At approximately 2:00 p.m. on July 2, 1977, Quick instructed Lorenz to wait for Doe in the lobby of Wallkill and to escort him directly to the superintendent's office. When Doe and Lieutenant Lorenz arrived at that office, Quick informed Doe that they were going to search him. After being directed by Quick to empty his pockets, Doe placed the contents of his pockets on a table. As Doe did so, a Sergeant Meinsen checked these items.

At this point, Superintendent Quick directed Doe to remove his clothes. Doe complied and handed them to Meinsen and Lorenz for inspection. Doe, when completely disrobed, was subjected to a strip search and a visual body-cavity search.

When Lorenz looked at the items that Doe had placed on the table, he noticed a sealed envelope which he picked up and found to be lumpy. Doe, observing Lorenz handling the envelope, stated that it was his envelope, that it contained a letter and that he wanted it back immediately. Superintendent Quick ordered Lieutenant Lorenz to open the envelope. As Lorenz was about to open it, Doe lunged across the table, grabbed the envelope, put it into his mouth and tried to chew it. Doe was restrained, the envelope retrieved and opened, and subsequently its contents were tested and determined to be marijuana.

*Mid-Orange*

On August 28, 1977, Jane Boe [7] and Sue Coe [8] were correction officers working at the Department's Mid-Orange Correctional Facility ("Mid-Orange"). At approximately 1:10 a.m. on August 28, 1977, Correction Lieutenant Countryman observed Boe and Coe standing and conversing at the perimeter fence of the facility. Twenty minutes later, Countryman approached the two officers and smelled what he believed to be marijuana smoke. Countryman relieved the officers from duty and directed them to report to the administration building; the two officers then left Countryman's presence.

Countryman called his superior, Correction Captain James, at home and informed him of his observations concerning Boe and Coe. When Countryman and James arrived at the administration building, they found Boe and Coe present. On Captain James' orders, Countryman called Mid-Orange Superintendent Gardineer at home and informed him of his observations concerning the officers, whereupon Gardineer came to the facility.

7. *Id.*

8. *Id.*

Shortly after Gardineer arrived, James and he consulted the Department's rules and regulations. Then, Gardineer informed Boe and Coe that they would be searched. Superintendent Gardineer, Captain James and Lieutenant Countryman escorted the officers to the female infirmary and the officers were subjected to strip searches by a female officer and a female nurse. No contraband was found.

*Fishkill*

On December 23, 1977, Correction Officer Steve Woe[9] was assigned to work at the Department's Fishkill Correctional Facility ("Fishkill"). On three or four occasions over a period of several weeks prior to this date, an inmate informant told Inspector General George Seyfert of the Department that Woe was bringing drugs into Fishkill and selling them to inmates. During their first meeting, the informant told Inspector General Seyfert that Woe came to work with a leather shoulder bag that he left in his car until he had punched his time card and had checked to make sure that no shift searches were being conducted. Then, Woe would go back to his car and return with the leather shoulder bag, which purportedly contained drugs that he would sell to inmates.

Sometime prior to December 23, 1977, Seyfert passed this information on to Correction Lieutenant Ronald Miles. On December 22, 1977, Seyfert gave money to the informant and instructed him to purchase marijuana from Woe on December 23, 1977. Seyfert notified Lieutenant Miles of his instructions to the inmate informant. Miles, in turn, relayed this information to a superior officer and stated that he would be at Fishkill the next morning.

At approximately 6:00 a.m. on December 23, 1977, when Woe arrived at Fishkill, Miles ordered him to enter a room, informed him that it was his turn to be searched and directed him to empty his pockets. Woe complied. Miles pat frisked Woe, directed him to disrobe completely

and then subjected him to a strip search and a visual body-cavity search. No contraband was found.

*Eastern*

On June 26, 1979, David Rogers, Richard Bullock, Robert J. Mizerak, Thomas J. Lynch, Richard Budd, Richard J. Schrade, Pedro Berrios, James Foe[10] and Larry Goe[11] were correction officers assigned to the Department's Eastern Correctional Facility ("Eastern"). Prior to that date, Eastern Superintendent Walter Fogg had received many general rumors that Foe and Goe were bringing contraband into the facility and supplying it to inmates. Fogg received these rumors from two uniformed supervisors and one inmate informant. The informant, who had been an informant for Fogg at another correctional facility, told Fogg that he had heard rumors that Foe and Goe were dealing heavily in drugs. The inmate did not inform Fogg that he had seen Foe or Goe in possession of contraband. Further, the uniformed supervisors did not inform Superintendent Fogg of specific information concerning either Foe or Goe vis-a-vis contraband.

Superintendent Fogg took no steps to determine whether the rumors concerning Foe or Goe were true, but based on the general rumors and the amount of contraband that was entering the facility, he ordered searches of Foe and Goe and he assigned a Lieutenant Demskie to oversee the searches. Fogg also authorized the searches of several other correction officers so that Foe and Goe would not suspect that they were the particular targets of the searches, thereby jeopardizing possible future searches and investigations.

The other officers, selected solely at random for the searches, were Officers Rogers, Bullock, Mizerak, Lynch, Budd, Schrade and Berrios. Each of these officers was taken individually into a room and ordered by two uniformed sergeants to disrobe. Each of the officers disrobed and was subjected to a strip search and a visual

9. *Id.*

10. *Id.*

11. *Id.*

body-cavity search. No contraband was found. At the time that he authorized the search, Superintendent Fogg, it is conceded, did not believe that he had a sufficient basis to obtain a search warrant from a court for any of the searches.

*Otisville*

On August 16, 1979, Correction Officer Debbie Noe [12] was assigned to the Department's Otisville Correctional Facility ("Otisville"). Several months prior to August 16, 1979, an inmate informant told the facility's Lieutenant Thomson that Officer Noe was bringing liquor into Otisville in a shopping bag or pocketbook and leaving it in the law library. The informant also told Thomson that inmates obtained liquor by taking it from the pocketbook or the shopping bag in the library and putting money in its place. Finally, the informant told Lieutenant Thomson that he personally had not observed any of these events.

Within one or two weeks, Lieutenant Thomson discussed the information that he had received from the informant with a subordinate, Sergeant Zelinsky. Zelinsky told Thomson that he had received similar information from an unnamed inmate source.

Thomson and Zelinsky received similar information from inmates over a period of

several months prior to August 16, 1979, but prior to this date Lieutenant Thomson did not observe Noe bring any contraband into Otisville, nor did Zelinsky tell Thomson that he had observed Noe bring any contraband into the facility. In mid-July, 1979, Otisville Superintendent Philip Coombe, Jr., learned through one Captain Payton that Thomson and Zelinsky had received these rumors concerning Officer Noe.

On August 16, 1979, between 3:00 p.m. and 4:00 p.m., Sergeant Zelinsky brought Noe and a shopping bag to Lieutenant Thomson's office. Zelinsky showed Thomson a bottle of rum that he had found in the bag when Noe reported to work.

Thomson notified Captain Payton and Superintendent Coombe about the rum; Coombe ordered that Noe be searched. Lieutenant Thomson directed a nurse and two female correction officers to search Noe and she was subjected to a strip search. No further contraband was found.

On December 26, 1979, the Department issued Interim Directive # 4936. The subject of the directive was "Search of [Department] Employees." In addition to stating the purpose [13] for such searches, the directive set forth detailed procedures for "strip frisk" searches.[14]

---

12. *Id.*

13. Under the heading "Purpose," the directive stated:

The presence of contraband within a correctional facility and its subsequent possession and/or use by inmates threatens the security of the facility; it endangers the safety of inmates, employees, visitors, and the community.

Introducing or possessing contraband in a facility is a violation of law and violators are to be prosecuted. Employees attempting to introduce contraband or in possession of contraband shall be subject to both prosecution and disciplinary action.

Sound security operations require routine, periodic, and special searches of all persons entering the facility. This directive outlines the security procedures to be followed in searching employees while on facility property....

....

Among the many procedures that may be taken to ensure safe and secure facilities is

the procedure that permits the searching of employees at any time that they are on facility property. The need for this procedure has been demonstrated by those occasions when employees have been found to possess contraband within the facilities.

It must also be recognized that all facility employees shall be treated fairly and in a dignified manner on those occasions when a search is required.

14. The directive outlines the following procedures for searches:

a. A strip frisk of an employee may only be conducted on the order of the Superintendent or Acting Superintendent. (The Officer of the Day may issue this order if the Superintendent or Acting Superintendent is absent from the facility and cannot be contacted).

b. Strip frisks must be supervised by a uniformed supervisor having at least the rank of Lieutenant.

c. No more than two frisking employees are to be present in addition to the supervising officer.

*Woodbourne*

On December 31, 1979, Correction Officers Adam Cassiack, Stephen Tasrak, Robert Hillson, Peter Brickner and Bob Hoe [15] were assigned to the Department's Woodbourne Correctional Facility ("Woodbourne"). During October or November of 1979, Deputy Superintendent Dominick Mantello received information from an inmate informant that he had observed Officer Hoe dealing in contraband with inmates. Mantello had learned prior to December 25, 1979, from one Lieutenant Duquette, that the inmate had informed Duquette that he had seen another inmate give Hoe money for drugs at Woodbourne's Italian-American Festival and that the inmate had stated that three other inmates had purchased drugs or liquor from Hoe. In addition, Mantello had received, over a period of several "weeks or months," information by way of general rumors that Hoe was selling drugs to inmates.

On the basis of these rumors about Hoe and the information received from the inmate informant, Mantello speculated that Hoe had been selling drugs to inmates for a considerable period prior to December 1979, and that he was likely to continue to do so in the future unless stopped. On December 31, 1979, Captain Peters requested of Mantello authorization to search Hoe when he reported for duty that day. There was no specific information that Hoe was bringing contraband into Woodbourne on December 31, 1979, however earlier, Peters had told Mantello that the inmate informant had stated that a "drop" was imminent. During his conversation with Mantello on December 31, 1979, Captain Peters told him that Hoe had been off duty for several days prior to December 31, 1979, and he suspected that Hoe might bring contraband in that day.

At approximately 1:00 p.m. on December 31, 1979, Mantello called the Department's central office and reported these general rumors, the specific information received from the inmate informant concerning Hoe, and the plan to search Hoe and several other correction officers when they came to work at 3:00 p.m. Mantello, in his capacity as Acting Superintendent of Woodbourne, authorized these searches and placed Captain Peters in charge thereof.

When Cassiack, Hillson, Tasrak and Brickner reported for work that day, they were ordered to go to a facility training room. Hoe reported for work late. Upon arriving, he was ordered to go to the facility training room with uniformed supervisors. When Hoe arrived with the supervisors, Rule 201.21 was read to him, he was ordered to prepare for a search, and he was strip searched and subjected to a visual body-cavity search. All of the other correction officers in the training room were also subjected to strip searches and visual body-cavity searches. There was no information that Cassiack, Hillson, Tasrak or Brickner had ever been involved in bringing contraband into Woodbourne. Each was selected for a search solely on a random basis.

On March 17, 1980, the Department issued Directive #4936, which superseded

d. Strip frisks shall be conducted in a location and manner which will cause the least possible embarrassment to the employee being searched.

e. The supervising and searching officers must be of the same sex as the employee being searched. If a ranking female security supervisor is not available, the Superintendent shall designate a female (holding a higher grade than the employee being searched) to conduct the search.

f. An employee may refuse to submit to a strip frisk, but such refusal shall be cause to deny the employee's entrance to the facility and shall be grounds for disciplinary action.

g. The employee being searched may request the presence of a witness or representative of an employee organization. If the employee being searched is a non-uniformed employee, every effort should be made to have the employee's supervisor present during the search if the employee so requests.

h. Subsequent to the search, the employee will on request be provided with a statement which will include: date of search, time of day, location, identification of searching employees, supervising officer, representative or witness present, and the results of the search.

15. *See supra* note 5.

Interim Directive # 4936 but was identical in all respects.[16]

*Arthur Kill*

On August 27, 1980, Correction Officers David L. Bowser, George Loe,[17] Melvin Bullock and Benjamin Whaley were assigned to the Department's Arthur Kill Correctional Facility ("Arthur Kill"). Also assigned there was Correction Lieutenant Squire Simpson.

Prior to that date, Deputy Superintendent Henry DeLuca had received general rumors from inmates that drugs were being brought into Arthur Kill by employees. Further, it is undisputed that a large quantity of drugs was coming into Arthur Kill during this time period. One or two days prior to August 27, 1980, as DeLuca passed an inmate informant in a corridor, the inmate informed him that a correction officer, Loe, was to bring marijuana into the facility on August 27, 1980. The inmate informant previously had given information that had resulted in the discovery of marijuana and money in inmate housing units, however, he had never given the names of any employees allegedly involved with the contraband. The informant gave DeLuca no additional information concerning Loe or the source of his information.

The superintendent of the facility, Dunham, upon receiving this information, authorized searches of Loe and several other correction officers. When Correction Officers Bowser, Bullock, Whaley and Loe arrived for work on August 27, 1980, they were brought to Deputy Superintendent DeLuca's office. Either Loe or Hunt, a union representative, or both of them demanded to see a search warrant. DeLuca informed them that he did not need one. As directed, each officer emptied his pockets pursuant to instructions and each officer disrobed down to his underwear. No contraband was found.

*The Litigation*

On January 24, 1980, Woodbourne Correction Officers Adam Cassiack, Stephen Tasrak and Robert Hillson commenced an action *("Cassiack")* in the United States District Court for the Southern District of New York. Named as defendants were Woodbourne Deputy Superintendent Dominick Mantello, Captain Andrew Peters, Lieutenant Vincent Eltz, Lieutenant Ward Burlingame, Sergeant Robert Johnson and Sergeant Robert McClay. The complaint, brought pursuant to 42 U.S.C. § 1983 (1976), alleged that the searches at Woodbourne on December 31, 1979, violated the protections secured for the plaintiffs by the United States Constitution under the fourth, fifth, sixth, eighth and fourteenth amendments. The plaintiffs sought, *inter alia*, injunctive relief that would prohibit the defendants from conducting searches and each plaintiff sought an award of compensatory damages in the amount of $1,000,000 and punitive damages in the amount of $500,000.

On February 14, 1980, plaintiff Security and Law Enforcement Employees, District Council 82, American Federation of State, County and Municipal Employees, AFL–CIO ("Council 82"), the certified representative of the Department's employees in the security services unit and the security supervisors unit, commenced a separate action *("Council 82")* pursuant to 42 U.S.C. § 1983 (1976) in the United States District Court for the Southern District of New York. Pursuant to Fed.R.Civ.P. 23, plaintiffs[18] in this action sought to have a class

---

16. On March 31, 1980, a revision notice pertaining to the March 17, 1980 directive was issued. The revision notice contained corrections of typographical errors as related to the directive.

17. *See supra* note 5.

18. The other named plaintiffs were: William Clay, treasurer of Council 82; Richard Bischert, president of Council 82, Local 1151, which is composed of security services unit employees

employed at Woodbourne; William Lothrop, president of Council 82, Local 1041, which is composed of security services unit employees employed at Eastern; Robert Morse, president of Council 82, Local 1871, which is composed of security services unit employees employed as correction sergeants at all Department correctional facilities; George Frees, president of Council 82, Local 2951, which is composed of security supervisors unit employees employed as correction lieutenants at all correctional fa-

declared consisting of all persons similarly situated "who are either now or in the future will be employed by the New York State Department of Correctional Services as Correction Officers, Correction Sergeants and Correction Lieutenants." Council 82 named as defendants: Hugh Carey, Governor of the State of New York; Thomas A. Coughlin, III, Commissioner of the Department; Walter Fogg, superintendent of Eastern; and Robert Kuhlman and Dominic Mantello, superintendent and deputy superintendent, respectively, of Woodbourne.

Council 82's complaint alleged that the defendants deprived the plaintiffs of their rights under the United States Constitution, particularly the fourth and fourteenth amendments. Council 82 also alleged that the defendants were violating the Constitution by forcing the correction sergeants and lieutenants to choose between putting their employment in jeopardy and violating the constitutional rights of others. Council 82 asked the district court to grant a "temporary" injunction and a permanent injunction prohibiting the defendants from conducting warrantless searches of members of the proposed plaintiff class "which require them to disrobe and/or exhibit their genitals and body cavities for examination"; that the district court grant a declaratory judgment that the enforcement of Rule 201.21 and Directive # 4936 constitutes a violation of the rights of plaintiffs and members of the plaintiff class; that the district court grant a declaratory judgment that the enforcement of Rule 201.21 and Directive # 4936 constitutes a violation of the rights of the correction sergeants and correction lieutenants by requiring them to carry out the policies of the rule and directive; and that the district court grant judgment against the defendants jointly and severally and direct them to indemnify and hold harmless members of the plaintiff class who are required by judgment or settlement of an action to pay

damages to a third party as a result of complying with an order to enforce Rule 201.21 or Directive # 4936 against such third party. Finally, Council 82 asked that judgment be granted in favor of plaintiffs Mizerak, Budd, Lynch and Schrade of Eastern for compensatory and punitive damages in the sum of $1,000,000 each against defendant Superintendent Walter Fogg of Eastern. Council 82 filed an amended complaint on March 6, 1980, which in addition to expanding the factual predicates for its class action request, asked that the district court grant plaintiffs costs and attorneys' fees.

On May 30, 1980, Council 82 moved for an order determining that the action be maintained as a class action, that the action filed on behalf of Adam Cassiack and others be consolidated with the *Council 82* action and that the district court grant a preliminary injunction pursuant to Fed.R. Civ.P. 65.

After considering opposition from the defendants to the application for class certification and a preliminary injunction and opposition from the *Cassiack* plaintiffs regarding the application for consolidation, the district court filed an opinion and order on January 27, 1981. Therein, the district court granted a motion to dismiss Governor Carey as a defendant; denied the defendants' request for summary judgment on the reasonableness or lack of reasonableness of warrantless searches of prison employees; granted Council 82's motion for consolidation of the constitutional issues and qualified immunity issues in the two cases; and granted Council 82's motion for class certification pursuant to Fed.R.Civ.P. 23. As to the class certification, the district court granted the motion, albeit with understandable hesitance, in light of possible conflicts among claimants. The district court also denied Council 82's motion for a preliminary injunction.[19]

cilities; Robert J. Mizerak, Thomas F. Lynch, Richard Budd and Richard J. Schrade, all employed as correction officers at Eastern and

members of the security services bargaining unit represented by Council 82.

**19.** The district court also granted the requests of Richard Budd and Robert Mizerak, both in-

On May 29, 1981, Council 82 moved to amend its complaint to add five individual class members as named plaintiffs on the ground that they were subjected to, or forced to participate in, a search that occurred after the filing of the amended complaint in the action. Pursuant to Fed.R. Civ.P. 15(d), the district court granted the motion allowing Council 82 to file and serve a supplemental complaint.[20]

The district court conducted a bench trial on October 28, 29 and November 1, 1982. The plaintiffs submitted stipulated facts together with excerpts from the testimony of the highest ranking official in the Department who was deposed, Deputy Commissioner William Gard, and from the deputy superintendent of Arthur Kill, Henry DeLuca. Correction Lieutenant Squire Simpson of Arthur Kill was the only live witness called to testify on behalf of the plaintiffs. The defendants called as witnesses two outside experts in correctional facility operations and security, Charles Fenton and Michael Quinlan. The defendants also called Deputy Commissioner Gard, Superintendents Fogg, Quick, Coombe, Kuhlmann, Charles Scully and Deputy Superintendents Mantello and De-Luca.

In its decision of January 27, 1983, the district court held that "a strip search, that is one requiring the employee to remove all his clothes and submit to an inspection of his naked body, authorized when the responsible prison official believes such to be justified[,] is not inconsistent with the constitutional rights of the plaintiff class." Further, the district court held that "strip frisk searches, that is, searches including [visual examination of] body cavities of se-

curity employees do not appear to serve any useful penological purpose." Finally, the district court stated that "[t]he officials who heretofore ordered such strip frisk searches that this opinion finds improper proceeded, however, in good faith and are, therefore, immune from suit by plaintiff class." The district court dismissed plaintiffs' claims and awarded judgment to the defendants. Judgment was entered on January 31, 1983. On February 18, 1983, Council 82 appealed from that portion of the judgment that dismissed its complaint. No appeal has been taken from the dismissal of the *Cassiack* complaint, the first of the consolidated cases.[21]

## III. DISCUSSION

Council 82 raises two issues on appeal: whether warrantless searches of correction officers are unreasonable under the fourth and fourteenth amendments of the Constitution; and whether the correction officials who ordered the warrantless searches are immune from liability for damages based upon the defense of qualified immunity. We proceed to address each issue *seriatim*.

### A. Strip Searches

The fourth amendment provides that:

The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.[22] It is settled that the fourth amendment protects people, not

---

volved in the Eastern searches of June 26, 1979, that they be listed as plaintiffs in the *Cassiack* action instead of the *Council 82* action.

**20.** The supplemental complaint added David L. Bowser, Charles E. Gordon, Jr., Melvin L. Bullock, Benjamin Whaley and Squire Simpson as named plaintiffs and Henry DeLuca as a named defendant.

**21.** The December 31, 1979, Woodbourne searches are not involved in this appeal because

of the decision not to appeal the *Cassiack* action; further, Richard Budd and Robert Mizerak, listed in the *Cassiack* action, are also not involved in this appeal. *See supra* note 19.

**22.** Of course, the fourth amendment is enforceable against the states through the fourteenth amendment. *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967); *Ker v. California,* 374 U.S. 23, 30, 83 S.Ct. 1623, 1628, 10 L.Ed.2d 726 (1963).

places. *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968); *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). The purpose of the fourth amendment is to protect people from arbitrary and oppressive governmental conduct. *Michigan v. Tyler,* 436 U.S. 499, 504, 98 S.Ct. 1942, 1947, 56 L.Ed.2d 486 (1978); *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). Thus, the fourth amendment vests individuals with the right to be free from "unreasonable government intrusions into their legitimate expectations of privacy." *Chadwick,* 433 U.S. at 7, 97 S.Ct. at 2481; *see also Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979); *Terry,* 392 U.S. at 9, 88 S.Ct. at 1873.

■ The fourth amendment prohibits only unreasonable searches, *Carroll v. United States,* 267 U.S. 132, 147, 45 S.Ct. 280, 283, 69 L.Ed. 543 (1925); therefore, the test in a fourth amendment case is whether the search was reasonable. To determine reasonableness, the court must balance the intrusiveness of the search on the individual's fourth amendment interests against its promotion of legitimate governmental interests. *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65 (1983); *United States v. Villamonte-Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 2579, 77 L.Ed.2d 22 (1983); *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *see also United States v. Martinez-Fuerte,* 428 U.S. 543, 555, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976); *Terry,* 392 U.S. at 20–21, 88 S.Ct. at 1879–1880. The Supreme Court has stated:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted,

the justification for initiating it, and the place in which it is conducted.

*Bell,* 441 U.S. at 559, 99 S.Ct. at 1884.

■ An examination of the first prong of the reasonableness test—the intrusion on the individual's fourth amendment interests—requires that the intrusion be viewed in the context of the individual's legitimate expectation of privacy. The test for determining when an expectation of privacy is legitimate was stated by Justice Harlan in *Katz*: "[T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring); *see also Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

■ Under the first prong of Justice Harlan's expectation of privacy test, we are unaware of any evidence herein that would indicate that the correction officers did not exhibit an actual, subjective expectation that they would not be subjected to unreasonable intrusions into their privacy. There is no dispute that, at the time of the searches, none of the corrections officers were serving a sentence of imprisonment for conviction of a crime, none were being detained following arraignment upon a criminal charge, and none were under arrest for a criminal charge. Assuming for present purposes that incarcerated individuals retain some fourth amendment rights, *Bell,* 441 U.S. at 558, 99 S.Ct. at 1884, it follows that correction officers, as non-convicted, non-detained and unincarcerated individuals, surely possess expectations of privacy. However, we note, and the parties acknowledge, that each correction officer, at the commencement of employment with the Department, received a rule book containing either Rule 4.20 or its successor, Rule 201.21. Thus, each correction officer at the outset of such employment had notice that the Department's employees while on correctional facility property were sub-

ject to being searched.[23] Further, even though the correction officers were unincarcerated persons at the time of the searches herein, they were unincarcerated persons working in facilities of incarceration. Therefore, while it is evident that correction officers retained certain expectations of privacy, it is also clear that based upon the nature of their place of employment and the notice provided by the Department in the rule book at the time of hire, their subjective expectations necessarily were diminished significantly.

■ Next, under Justice Harlan's test, we believe that society is prepared to recognize as reasonable the proposition that correction officers have diminished expectations of privacy in light of the difficult burdens of maintaining safety, order and security that our society imposes on those who staff our prisons. Any contrary conclusion would be unwarranted. Certainly, society would not be prepared to recognize within the confines of correctional facilities the existence of the more substantial expectations that ordinary citizens generally enjoy as free persons in the community. *See United States v. Thomas,* 729 F.2d 120, 123 (2d Cir.1984) (expectations of privacy can vary, depending on circumstances and location). However, we believe that even within the unique confines of correctional facilities, society recognizes that correctional officers, as Council 82 strongly argues, have expectations—albeit

diminished—that they will be free from excessive and unwarranted intrusions based upon unrestrained, standardless exercises of authority by prison administrators.

The second prong of the reasonableness test—the promotion of legitimate governmental interests—requires us to examine the justifications asserted for the searches. The defendants contend that the search procedures are related directly to the penological imperatives of maintaining prison security and preserving internal order and discipline. Council 82 itself recognizes that contraband, including money and drugs, in correctional facilities poses a serious danger to both inmates and staff. In fact, Council 82 states that its members "have a greater stake in eliminating contraband and its sources than the prison administrators, since it is they who must work among the inmates where the effects of the contraband are most strongly felt."

■ We echo the sentiments of the parties. "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Further, in prisons there exists "the ever-present potential for violent confrontation and conflagration." *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 132, 97 S.Ct.

---

**23.** Council 82 asserts in its brief that the defendants claimed that the correction officers waived their fourth amendment rights by accepting employment in the correctional facilities. We do not construe defendants' argument as asserting that the correction officers consented to being searched merely by accepting employment and by receiving the rule book. However, if that is the claim, we reject it. In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court stated that a person relying on consent to justify the lawfulness of a search has the burden of proving that consent was, in fact, freely and voluntarily given. *Id.* at 222, 93 S.Ct. at 2045. Further, a careful scrutiny of the totality of the circumstances must occur. *Id.* at 226, 93 S.Ct. at 2047. Most importantly, evidence that the person had knowledge of the right to refuse to give consent may be taken into account. *Id.* at 249, 93 S.Ct.

at 2059. On the record herein, these determinations could not be made. However, we do think it appropriate to consider the acceptance of employment in the Department's facilities, coupled with receipt of the rule books at the commencement of employment, as factors to be taken into account in determining the extent of the legitimate expectations of privacy of the correction officers. *See Armstrong v. New York State Commissioner of Correction,* 545 F.Supp. 728, 731 (N.D.N.Y.1982) (careful factual inquiry must be undertaken to determine if correction officer gave voluntary consent to be strip searched). *But see United States v. Sihler,* 562 F.2d 349, 350–51 (5th Cir.1977) (where large sign, passed by prison employee each day, warned that all persons entering prison were subject to search, search of prison employee's lunch bag deemed based on consent).

2532, 2541, 53 L.Ed.2d 629 (1977). Correctional facilities are unique places "fraught with serious security dangers." *Bell*, 441 U.S. at 559, 99 S.Ct. at 1884; *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir.1982) (recognizing that "[i]ncidents in which inmates have obtained drugs, weapons, and other contraband are well-documented in case law and regularly receive the attention of the news media"). Clearly, the security problems faced by prison administrators are difficult, complex and challenging. Thus it is fundamental that we recognize the legitimate penological imperatives of maintaining prison security and preserving internal order and discipline.

Nonetheless, Council 82 contends that warrantless searches of correction officers violate the fourth and fourteenth amendments. Further, Council 82 asserts that the real reason for defendants' resistance to the constitutional warrant requirement appears to be a sincere desire by the Department to keep contraband out of correctional facilities, coupled with a fear that search warrants could not be obtained; that the goal of achieving institutional security does not justify subjecting a correction officer to a warrantless search; that the defendants could have obtained search warrants for the searches herein; and that correction officers, as free citizens, should not have their rights measured against standards applicable to convicted inmates and accused pretrial detainees.

The defendants contend that the United States Constitution does not require a search warrant before the Department's security personnel can be searched. Further, they argue that whether a warrant might have been obtained, or might not have issued, is irrelevant to the issue of whether a warrant is constitutionally required; that decisions by prison administrators concerning control of contraband must be accorded wide-ranging deference in order to preserve internal order and to maintain institutional security; that oft-times information available to prison officials would justify ordering a search but that a warrant could not be obtained; and that a warrant requirement would prevent immediate action and thus could lead to the disposal of contraband.

First, we hold that warrantless strip searches of correction officers within correctional facilities are not per se violative of the fourth and fourteenth amendments of the Constitution. We note that although the fourth amendment generally requires that a warrant based on probable cause issue before a search occurs, *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879, exceptions to this requirement exist where a legitimate governmental purpose makes the intrusion into privacy reasonable. *See, e.g., Bell*, 441 U.S. at 560, 99 S.Ct. at 1885 (pretrial detainees may be strip searched without warrant based on probable cause after contact visit); *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 476, 38 L.Ed.2d 427 (1973) (search incident to arrest does not require warrant based on probable cause); *Terry*, 392 U.S. at 27, 30, 88 S.Ct. at 1883, 1884 (police officer may conduct a pat-down "stop-and-frisk" search without a warrant based on probable cause).

Second, we agree that whether a warrant might issue in a given situation can be irrelevant to the question of whether a warrant is required. *See Lafayette*, 103 S.Ct. at 2608 n. 1; *United States v. Edwards*, 415 U.S. 800, 807, 94 S.Ct. 1234, 1239, 39 L.Ed.2d 771 (1974). The key question herein is whether the subject searches were reasonable in the absence of warrants.

After applying the reasonableness test, and thus weighing the legitimate governmental interest in maintaining correctional facility security against the invasion of privacy in light of correction officers' diminished expectations of privacy, we conclude that strip searches of correction officers, under certain circumstances, may be reasonable in the absence of warrants issued on the basis of probable cause. Our task is to determine what constitutes proper circumstances. In making this determination, the reasonableness test "requires, at a minimum, that the facts upon which an

intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." *Prouse,* 440 U.S. at 654, 99 S.Ct. at 1396 (footnotes omitted). In light of this requirement, it is our view that a reasonable suspicion standard should govern strip searches of correction officers working in correctional facilities.

We derive support for the adoption of the reasonable suspicion standard, by way of analogy, from certain border-search cases of this court. In *United States v. Asbury,* 586 F.2d 973 (2d Cir.1978), we stated that a person entering or leaving the country "does not expect that his entry or departure, standing alone, will cause him to be subjected to a strip search." *Id.* at 975. We went on to state that "[b]efore a border official may insist upon such an extensive invasion of privacy, he should have a suspicion of illegal concealment that is based upon something more than the border crossing, and the suspicion should be substantial enough to make the search a reasonable exercise of authority." *Id.* at 975–76. The court, rejecting the "real suspicion" nomenclature of the Ninth Circuit, implied that the test of whether "the border official has a reasonable basis on which to conduct the search" would be known as the reasonable suspicion standard. *Id.* at 976. Since *Asbury,* this circuit has applied the reasonable suspicion standard consistently in similar border-search cases. *See, e.g., United States v. Sanders,* 663 F.2d 1, 3 (2d Cir.1981) (removal of artificial leg reasonable); *United States v. Moody,* 649 F.2d 124, 127 (2d Cir.1981) (border search requiring pulling down of girdle reasonable).

■ Not unlike persons crossing the borders of our country, correction officers, under proper circumstances, may be subjected to strip searches in order to control the flow of contraband. Like the important governmental interest in controlling the flow of contraband into this country, there exists a similarly important governmental interest in controlling the flow of contraband into correctional facilities.

Further, not unlike persons crossing our borders, correction officers have diminished expectations of privacy, under appropriate circumstances, regarding intrusions such as strip searches. We conclude that strip searches of correction officers in correctional facilities, like strip searches of persons at borders, should not be subject to the warrant requirement of the fourth amendment.

We also draw support for our adoption of the reasonable suspicion standard in the unique context of a correctional setting from the recent decision of *Hunter v. Auger,* 672 F.2d 668 (8th Cir.1982). In *Hunter,* the court determined that the fourth amendment requires that the reasonable suspicion standard govern the strip searches of visitors to penal institutions. *Id.* at 674. We believe that there are significant parallels between visitors to correctional facilities and correction officers who work in them. First, both categories consist of citizens whom society obviously would recognize as having higher expectations of privacy while outside a correctional facility than while inside. Second, both consist of unincarcerated individuals who may be sources of entry of contraband into inmate populations and thus can pose potential hazards to the correctional facilities' goal of maintaining institutional security. Finally, once they have entered a correctional facility, both have diminished expectations of privacy.

■ Our adoption of the reasonable suspicion standard also is consistent with the Supreme Court's frequent acknowledgement that prison officials must have freedom to take appropriate action to ensure the safety of inmates and correction personnel, *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878, and that federal courts must afford some deference to prison administrators. *See North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. at 126, 128, 97 S.Ct. at 2538, 2539. *Meachum v. Fano,* 427 U.S. 215, 229, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976); *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974); *Preiser v. Rodriguez,*

411 U.S. 475, 492, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973); *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1084, 31 L.Ed.2d 263 (1972) (per curiam) (federal courts do not sit to supervise prisons). The Supreme Court has stated: "Responsible prison officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of a riot." *North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. at 132–33, 97 S.Ct. at 2541 (footnote omitted). The day-to-day problems of administering and operating correctional facilities are demanding and complex and this reality must be accorded some weight by federal courts even when confronted with constitutional challenges. *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878.

In sum, because of the uniqueness of correctional facilities, the deference to be accorded prison administrators, the legitimate governmental interests involved and the diminished expectations of privacy of correction officers, we reject Council 82's contention that warrantless strip searches are per se in conflict with the fourth amendment's requirement of reasonableness. We believe that the reasonable suspicion standard "is flexible enough to afford the full measure of fourth amendment protection without posing an insuperable barrier to the exercise of all search ... powers." *Hunter,* 672 F.2d at 674. Further, we reject the clear implication of Council 82's assertion that the goal of achieving institutional security can never justify subjecting a correction officer to a warrantless search and that a warrantless search of a correction officer will unconstitutionally allow a correction officer's rights to be measured by standards applicable to convicted inmates and accused pretrial detainees. For the reasons express above, we find no merit in these assertions.

### Application of the Reasonable Suspicion Standard

Given the applicability of the reasonable suspicion standard as discussed, it is neces-sary to examine individually the searches conducted herein as measured by that standard. Although the subject strip searches were not per se violative of the fourth amendment because of the absence of search warrants based on probable cause, the question remains whether they were violative of the reasonableness requirement of the fourth amendment when measured against the objective standard imposed by the reasonable suspicion test.

■ While undoubtedly the individual facts of future cases will provide the reasonable suspicion standard with more specificity, there presently are some principles that already give the test sufficient contours so that we can apply it herein. First, to justify the strip search of a particular correction officer under the reasonable suspicion standard, correction officials "must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience." *Hunter,* 672 F.2d at 674. Inchoate, unspecified suspicions do not meet this definition. *Id.* Further, the suspicion must be directed to a specific person. *Id.* at 675. Factors that may be taken into account in determining reasonable suspicion are: (1) the nature of the tip or information; (2) the reliability of the informant; (3) the degree of corroboration; and (4) other facts contributing to suspicion or lack thereof. *United States v. Afanador,* 567 F.2d 1325, 1329 n. 4 (5th Cir.1978).

### Coxsackie

■ Herein, the Department had reasonable suspicion to search Correction Officer John Roe at Coxsackie on June 6, 1977. Before the search, Correction Captain Anthony Umina, acting superintendent of Coxsackie, received information about Roe's contraband activities from a staff person and from Officer Vincent. The staff person previously had given Captain Umina information relating to security at Coxsackie that generally was reliable. Further, prior to the strip search, Sergeant Coons observed Roe place on a windowsill what appeared to be a cigarette containing

marijuana and that, although not determinative, later tested positive as to this content. These facts are sufficient to meet the reasonable suspicion standard. Council 82, in effect, concedes this point in its brief when it asserts that defendants, on these facts, could have obtained a search warrant based on probable cause, a higher standard than reasonable suspicion.

## Wallkill

■ The evidence relating to the search of Officer Bill Doe at Wallkill on July 2, 1977, confirms that the Department had reasonable suspicion to conduct a strip search. Initially, Superintendent Quick received information from a correction officer that an inmate believed that an escape was planned for August, 1977, and that Doe was involved. The inmate also related that Doe was bringing drugs into Wallkill on a regular basis. Later, the inmate delivered drugs to Lieutenant Lorenz in response to a request from the correction officials. Still later, the Department recorded a conversation in which Doe agreed with the inmate informant that he would bring hacksaw blades and marijuana into Wallkill. These facts are sufficient to meet the reasonable suspicion standard and to justify the Department's strip search of Doe. As with the Roe strip search, Council 82 essentially concedes this point in its brief when it states that the defendants on these facts could have obtained a search warrant based on probable cause.

## Mid-Orange

■ The Jane Boe/Sue Coe searches of August 28, 1977, present a closer situation. On that date, Correction Lieutenant Countryman observed Boe and Coe standing together at the perimeter fence at Mid-Orange and smelled what he thought to be marijuana smoke. There are no corroborating facts. No marijuana was seen or, for that matter, ever found in the subsequent strip search of the two officers. We do not believe that these circumstances justified the strip search based on the reasonable suspicion standard. In fact, the proffered justification for these searches comes close to vesting Lieutenant Countryman, an officer in the field, with unfettered discretion to search correction officers, which, standing alone, is repugnant to the guarantees of the fourth amendment.

## Fishkill

■ A similar result occurred with the strip search of Officer Steve Woe at Fishkill on December 23, 1977. In that situation, an inmate gave information to the Department that Woe was bringing drugs into Fishkill and selling them to inmates. There is no evidence that this inmate had a history of providing reliable information in the past. Further, there are no corroborating circumstances. These circumstances do not satisfy the reasonable suspicion standard. Thus, the fourth amendment rights of Woe were violated by the strip search on December 23, 1977.

## Eastern

■ The June 26, 1979 strip searches of Correction Officers James Foe and Larry Goe at Eastern were justified by circumstances that satisfy the reasonable suspicion standard. First, Superintendent Fogg received many general rumors from two uniformed supervisors and one inmate informant that Foe and Goe were bringing contraband into Eastern. Further, Fogg received the same information directly from an inmate who had been an informant for him at another institution. Finally, contraband had been turning up within Eastern. These facts justify the Department's strip search of Foe and Goe and are sufficient to satisfy the reasonable suspicion standard.

## Otisville

■ The August 16, 1979 strip search of Correction Officer Debbie Noe at Otisville was not violative of the fourth amendment. Prior to the strip search, the Department learned from an inmate informant that Noe was bringing liquor into Otisville. This information was corroborated by similar information received by

Correction Sergeant Zelinsky from a different source. Further, Lieutenant Thomson and Zelinsky, who had received the initial information from an inmate informant, received similar information from inmates over a period of several months prior to August 16, 1979. Finally, prior to the strip search, Noe's shopping bag was searched and a bottle of rum was found.[24] The totality of circumstances herein satisfy the reasonable suspicion standard and thus the strip search of Noe was not violative of the fourth amendment.

*Arthur Kill*

■■■ The August 27, 1980 strip search of Correction Officer George Loe at Arthur Kill also was reasonable under the fourth amendment. Prior to the strip search, the deputy superintendent of Arthur Kill had received general rumors that drugs were being brought into the facility by employees. In addition, it is undisputed that a great amount of drugs was coming into Arthur Kill during this time. Further, prior to the strip search, an inmate informant gave the Department specific information that Loe was planning to bring marijuana into the facility on August 27, 1980. This inmate previously had given the Department information that resulted in the discovery of marijuana and money in inmate housing units. These circumstances satisfy the reasonable suspicion standard and thus the strip search of Loe was not violative of his fourth amendment rights.

## B. *Visual Body-Cavity Searches*

The district court determined that the visual body-cavity searches "do not appear to serve any useful penological purpose" and that "these practices would also appear to threaten needlessly the morale of the security employee work force since, in this regard, they are being treated as if they were no different from convicted prisoners." Therefore, the district court held that "the inspection[s] of body cavities are unreasonable under the circumstances of this record." On appeal, Council 82 empha-

sizes that it is noteworthy that no contraband was found as a result of the visual body-cavity searches of the correction officers subjected to them herein. The defendants, however, contend that the entire search procedure is the only effective means of detecting contraband.

The Supreme Court in *Bell v. Wolfish*, a case that involved visual body-cavity searches of pretrial detainees, noted that "this practice instinctively gives us the most pause." 441 U.S. at 558, 99 S.Ct. at 1884. Further, Justice Marshall's dissent in *Bell* observed that the visual body-cavity searches "represent one of the most grievous offenses against personal dignity and common decency." *Id.* at 576–77, 99 S.Ct. at 1893. Justice Stevens, in his dissent, expressed the same view when he stated that visual body-cavity searches "—clearly the greatest personal indignity—may be the least justifiable measure of all." *Id.* at 594, 99 S.Ct. at 1903 (Brennan, J., joining).

Other cases have expressed similar concerns. For example, the Seventh Circuit in *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1983), a case involving women arrested on misdemeanor charges, noted that visual body-cavity searches are " 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission ....' " Id. at 1272 (quoting *Tinetti v. Wittke*, 479 F.Supp. 486, 491 (E.D.Wis.1979), *aff'd*, 620 F.2d 160 (7th Cir. 1980) (per curiam)).

■■■ The visual body-cavity searches are also subject to the *Katz* expectation of privacy test, as were the strip searches herein. As we indicated earlier regarding the strip searches, we are unaware of any evidence herein that would indicate that the correction officers who were subjected to the visual body-cavity searches did not exhibit actual, subjective expectations that they would not be subjected to unreasonable intrusions into their privacy. Further, logically, these expectations are even greater than the expectations regarding

---

**24.** *See supra* note 4.

the strip searches because the extent of these intrusions is much greater. Additionally, we do not believe that the receipt of the rule books at the commencement of employment coupled with the nature of the places of employment can be considered particularly compelling evidence of diminished subjective expectations on the part of the officers, given the magnitude of the indignity involved. Finally, we believe that, as applied to correction officers, society is prepared to recognize that the expectation of being free from the indignity of warrantless visual body-cavity searches continues to exist even within the confines of correctional facilities.

In contrast to the legitimate governmental interests asserted for strip searches, we believe that the governmental interests vis-a-vis visual body-cavity searches are diminished severely. The defendants conceded through the testimony of Deputy Commissioner Gard, the highest ranking officer in the Department to testify, that visual body-cavity searches are unlikely to produce contraband because the possibility is slight that guards would feel it necessary to conceal contraband in such areas. Thus, on this record, as the district judge found, these particular searches would seem to be unrelated to any legitimate penological objectives.

Mindful of the admonition that " 'the greater the intrusion, the greater must be the reason for conducting a search,' " *Afanador*, 567 F.2d at 1328 (quoting *United States v. Love*, 413 F.Supp. 1122, 1127 (S.D.Tex.), *aff'd*, 538 F.2d 898 (5th Cir.), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 628 (1976)), we agree with Council 82's contention that warrantless visual body-cavity searches of correction officers as occurred herein violate the fourth amendment.

This position is justified for several reasons. First, on the record before us, there is nothing to indicate that contraband has been carried into the subject correctional facilities by correction officers in their body cavities.[25] Thus, these visual body-cavity searches have not been shown to be related to any legitimate penological objective. Second, as the district court noted, such demeaning searches seriously erode correction officer morale. Finally, basic concepts of human dignity dictate a course of the utmost caution before an intrusion into the most private parts of the human body is allowed. In our view, a visual body-cavity search is nearly as degrading as a manual probe of a body-cavity itself and such a major invasion into privacy demands that a neutral person be interposed between the Department and a correction officer to ensure that the circumstances presented justify the intrusion. In short, we hold that before the Department may conduct a visual body-cavity search, it must obtain a search warrant based on probable cause from a judicial officer.[26]

---

**25.** Superintendent Philip Coombe of Eastern, employed by the Department for 23 years, stated that he knew of no instance where contraband was discovered in the anal or genital areas of correction officers. Also Superintendent Charles Scully of Green Haven Correctional Facility testified that he had never even heard of contraband being so discovered.

**26.** We have considered whether the requirement of obtaining a warrant based on probable cause will open an avenue for entry of contraband. Based on the record evidence, we think not. First, the requirement of obtaining a warrant does not announce a holding that the anal and genital areas of correction officers cannot be searched. Second, in addition to testimony by the Department's superintendents that they were not aware of past instances of contraband being so discovered, one of the defendants' expert witnesses, Charles Fenton, testified as follows:

> I have never had occasion to think that an employee would use a body cavity to carry contraband.
>
> I am not saying there is a difference between people because there is a different label on them, but there is a difference in circumstances. If an inmate wants to carry heroin from the visiting room into the institution, he knows he is going to be searched and he knows it will be a careful search. He is going to some great lengths to defeat that search and the better that search is the greater the lengths he will have to go to. He will have to swallow it and regurgitate it when he gets in, or swallow it and pass it, or insert it into the anal cavity or tape it between toes or some sort of very elaborate sort of thing.
>
> If he gets caught, his penalty is virtually nil. In fact, there is a social reward to that because he is the guy with heart that tried to

Consistent with this holding, we conclude that the visual body-cavity searches of Correction Officers Doe, Woe, Rogers, Foe and Goe violated the fourth amendment rights of these correction officers.

## C. Random Searches of Correction Officers

■ The district court, near the conclusion of its opinion, stated that it considered the random searches of correction officers unreasonable. We agree and hold that the searches pursuant to the Department's random-search policy were unreasonable under the fourth amendment.

The Department employed its random-search policy in conducting both strip searches and visual body-cavity searches. As we stated earlier, the justification for the strip search of a particular correction officer under the reasonable suspicion standard must be directed to a specific person.

*Hunter*, 672 F.2d at 675. Surely no less is required in order to obtain a search warrant for a visual body-cavity search. Obviously, no specific person of those randomly searched was the focus of either type of search; thus, the unreasonableness of such searches, falling short of the reasonable suspicion standard and the warrant requirement, is apparent.

The defendants testified at trial that it was assumed that the practice and policy of searching groups of correction officers when only one or two were under suspicion was an acceptable practice. The justification offered for this belief was that, should the search reveal no contraband, the target of the investigation would not know that he was under suspicion since others also were searched.

While this strategy may represent a good investigative technique,[27] it is an arbi-

---

carry it in, and so on, or he may have been compelled to carry it by threat of force and the reward is that he did his best and he won't get killed or beat up or whatever would have happened to him if he didn't do what he was told.

The employee is not going to bring anything if he has any reasonable basis for thinking he is going to get nailed with it.

As a matter of fact, in the ordinary institution the ordinary employee bringing something in would carry it in his lunch bucket and to actually put it in a thermos bottle would be extraordinary lengths. If it is on his person, it is tucked inside his belt, as I found the whiskey bottle, or in his pocket.

I would not expect to get much on a pat frisk. I think that is largely worthless, if you are serious. It is all right if you are trying to handle 500 inmates coming out of the mess hall and you are trying to prevent them from bringing out silverware. If you are serious about a search, a pat frisk is worthless. You must search a person thoroughly and carefully and that means his clothing and bend the shoes and look at the seams. I can't imagine an officer feeling so threatened about carrying something in that he would have to insert it in his rectum. If he felt it was that dangerous, I don't believe he would bring it in at all. Also, the rectal kinds of carrying capacity is so limited that—I have seen hacksaw blades and light bulbs and small gun barrels, but you cannot bring in a briefcase. The kind of thing brought in in the rectum is the kind of thing an inmate can bring in. Generally, an officer, if he is carrying, it is drugs or books or money or that kind of thing.

Furthermore, unlike Judge Van Graafeiland, we believe that the requirement of probable cause with a warrant, in visual body-cavity search situations, is neither "impractical" nor "completely unrealistic." The procedures for obtaining a warrant, at least in New York, are hardly so onerous as to render it "almost impossible to secure a proper warrant." Indeed, N.Y. Crim.Proc.Law § 690.36 (McKinney 1983–84 Supp.), provides for the issuance of search warrants via telephone or radio communications. Moreover, nothing in our opinion prevents prison officials from acting without hesitation if exigent circumstances necessitate a visual body-cavity search. Similarly, nothing in our opinion prevents a consensual visual body-cavity search.

27. The following exchange regarding the purpose of random searches took place between the district judge and Charles Fenton, one of defendants' expert witnesses:

THE COURT: Suppose you have reasonable cause to believe that A is bringing in contraband but you don't know whether or you are not sure he is going to bring in contraband on this particular day you don't want to have him as the only one searched because then if you don't find anything, there could be a problem. Under those circumstances, is it reasonable procedure to have a random search, including that man, even though you know the only people—you don't have any suspicion about the other people?

THE WITNESS: You make one of two choices there, your Honor. One is to detect and ap-

trary and insufficient basis upon which to justify such seriously intrusive practices that are so clearly violative of the guarantees of the fourth amendment. Random searches of correction officers are violative of the fourth amendment's mandate against unreasonable searches, and because correction officials know that, in these instances, there are no bases for any suspicions, such searches severely trammel the legitimate expectations of privacy of correction officers. Thus, the random searches of Correction Officers Rogers, Richard Bullock, Lynch, Berrios, Schrade, Bowser, Melvin Bullock and Whaley violated the fourth amendment.

### D. *Qualified Immunity*

After ruling on the issues presented in the liability phase of the bifurcated trial, the district court determined that the officials who ordered all of the searches herein that were improper "proceeded, however, in good faith and are, immune from suit by plaintiff class." The defendants urge this view upon us, contending that those defendants found to have ordered unreasonable searches are immune from liability for damages because they could not have been expected to predict the future course of constitutional law relating to these search and seizure issues. The defendants also contend that they could not know or reasonably be expected to know that a constitutional right might be implicated by the random-search procedure or by the visual body-cavity searches. Council 82 counters merely by asserting that the officials who ordered searches violative of the fourth

amendment are not entitled to immunity from damages.

Qualified immunity is an affirmative defense that must be pleaded by a defendant official. *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982). Further, qualified immunity is available to prison officials as a defense from liability for damages for actions taken in their official capacities. *Procunier v. Navarette*, 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978); *McCann v. Coughlin*, 698 F.2d 112, 124 (2d Cir.1983). In *Harlow*, the Supreme Court made clear that "if the official pleading the defense [of qualified immunity] claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained.... [T]he defense would turn primarily on objective factors." 457 U.S. at 819, 102 S.Ct. at 2739. Further, the Supreme Court noted:

Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences."

*Id.* (quoting in part *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967) (footnote omitted). Additionally, the Court added: "If the law at that time was not clearly established, an

---

prehend the guilty party, and that is a reasonable aim.

The second is to deter and prevent the contraband from coming in and I think that is a reasonable aim.

After years and years of fruitlessly chasing guilty parties and only really apprehending and arresting a comparatively few of those that were active, my own thinking went toward deterring and ending a practice. So I think either basis is reasonable depending on your aim. If your aim is to detect the guilty party and try to get a prosecution, then I would try to mask my intentions the way you

describe, so that if I miss this time, at a future time I might have a shot at it. If my intention was to put somebody out of business and if I didn't get him, he would get the message I was looking down his neck, then I would single out the person who was guilty and shake him down and not be too concerned whether I nailed him or not.

In the latter stages of my career I tended to lean towards the second procedure because I thought it was more important to prevent contraband than to catch who was bringing it in.

official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2739; *see also Navarette,* 434 U.S. at 562, 98 S.Ct. at 860 (official cannot be expected to predict the future course of constitutional law, but he will be liable if his action cannot reasonably be characterized as being in good faith); *Wyler v. United States,* 725 F.2d 156, 159 (2d Cir.1983).

Our recent decision in *McCann v. Coughlin,* 698 F.2d 112 (2d Cir.1983), a post-*Harlow* case, discusses similar principles. In *McCann,* we concluded that "[o]fficials are not required to predict future developments in constitutional adjudication, and can be held liable only for actions which were unlawful at the time in issue," *id.* at 124, and that prison officials have a "right to qualified immunity for actions taken in their official capacity if they act in good faith and on the basis of a reasonable belief that their actions were lawful." *Id.* We noted, however, that in some circumstances, a "slight uncertainty ... is insufficient to provide a basis for a legitimate claim of good faith immunity." *Id.* at 125.

■ We believe that the correction officials who ordered the unconstitutional strip searches, the unconstitutional body-cavity searches and the searches pursuant to the Department's random-search policy are entitled to qualified immunity from liability for damages. These officials operated in an area in which the law was not charted clearly. Further, although erroneously conducted, from our review of the record, it appears that these searches were conducted based upon the defendants' good-faith reliance on the Department's rules and regulations in effect at the time.

## IV.  CONCLUSION

For the foregoing reasons we reverse and remand to the district court with instructions to consider the appropriateness of entering an order granting declaratory or injunctive relief prohibiting warrantless visual body-cavity searches and prohibiting random searches of correction officers.

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:

Justice Rehnquist stated in *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), that "[a] detention facility is a unique place fraught with serious security dangers." He also observed quite correctly that "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Id.* See, *e.g., United States v. Stassi,* 544 F.2d 579, 582 (2d Cir.1976), *cert. denied,* 430 U.S. 907, 97 S.Ct. 1176, 51 L.Ed.2d 582 (1977) (major narcotics conspiracy "hatched" in federal penitentiary); *Palmigiano v. Garrahy,* 443 F.Supp. 956, 967 (D.R.I.1977), *aff'd,* 616 F.2d 598 (1st Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980) ("Prison officials estimate that 70–80% of inmates in Maximum are current drug users, including perhaps 40 heroin addicts. The traffic in contraband is a major cause of violence."); *Pugh v. Locke,* 406 F.Supp. 318, 327 (M.D.Ala. 1976), *aff'd sub nom. Newman v. Alabama,* 559 F.2d 283 (5th Cir.1977), *rev'd in part on other grounds sub nom. Alabama v. Pugh and cert. denied,* 438 U.S. 781, 915, 98 S.Ct. 3057, 3144, 57 L.Ed.2d 1114, 1160 (1978) ("Gambling, smuggling, and extortion are several of the abuses fueled by the failure of prison officials to control the possession of currency inside the institution."); *Holt v. Sarver,* 309 F.Supp. 362, 377 (E.D.Ark.1970), *aff'd,* 442 F.2d 304 (8th Cir.1971) ("prevalent consumption of liquor and beer and ... use of drugs ... not uncommon for many, if not all, of the inmates of a particular barracks to become intoxicated by drugs and alcohol all at the same time").

It is against the "unique" background of a penal institution that the constitutionality of appellees' attempts to eliminate smuggling must be examined. Senator Sam Nunn, who presided at a Senate hearing in which there was testimony about a million-dollar-a-year drug operation at the federal

prison in Atlanta and the smuggling in of drugs, liquor, groceries, toilet articles and money, concluded that "corruption of public officials is a cornerstone of organized crime's success." *Hearings on Organized Criminal Activities Before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs*, 95th Cong., 2d Sess., pt. 1, 307 (1978). It hardly can be gainsaid that few individuals are more constantly exposed to corrupting influences than are those who guard hardened criminals grouped together in an institution and in control of large amounts of illicit funds. Fortunately, most correction officers are upright and honest men who are able to resist temptation. However, this is not true of all of them.

John P. Flannery, a former Assistant United States Attorney for the Southern District of New York, is the author of an interesting article entitled "Prison Corruption: A Mockery of Justice", which can be found at pages 271–292 of 2 *Prisoners' Rights Sourcebook*, published in 1980 by Clark Boardman Company, Ltd. Mr. Flannery says:

Prison and its condition have been at the heart of a plethora of court decisions, the focus of much legislation, and the object of suggested and implemented court, legislative, and administrative reform. There is, however, one determinant of the prison condition that is not usually considered in these discussions. It is the corrupt acts of prison officials. Official corruption pervades the prison system, and necessarily compromises the integrity of and safety within the prison. It inequitably distributes privilege to those who can afford to pay for it.

. . . .

[O]fficers have had sex with inmates; brought them contraband, including food, liquor, narcotics, and money used in at least one case to pay for an inmate's execution; taken inmates out of prison on unauthorized trips, for a price; helped them get to the prison of their choice, also for the right price; and finally helped them escape, generally for a higher price. Prison employees have permitted and participated in crimes for which they are empowered to arrest the offenders. The officials who performed these corrupt acts have even included two successive chaplains at one prison facility. The inmates, for the most part, have been organized crime figures. The other inmates—who can not pay, and are relatively minor offenders without "connections"—do without these favors, but are unalterably and adversely affected by what they cannot fail to see.

*Id.* at 271, 273–74.

One need not subscribe in full measure to the foregoing statements to realize that a problem of employee honesty and ethics exists in every correctional institution. *See, e.g., United States v. McCrary*, 699 F.2d 1308, 1311–12 (11th Cir.1983). It is essential, therefore, that prison administrators be accorded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish, supra*, 441 U.S. at 547, 99 S.Ct. at 1878.

At first blush, a holding that no strip search may take place in the absence of a reasonable suspicion that contraband will be found does not seem to place too heavy a burden on prison administrators. However, I believe we reasonably may expect that, after the majority opinion is filed, appellants and their colleagues will challenge every search that is made, *see Gettleman v. Werner*, 377 F.Supp. 445, 449 (W.D. Pa.1974); and I can think of no better way to dry up sources of information than to require prison officials to disclose in each instance the basis for their reasonable suspicion. Moreover, the majority's "Application of the Reasonable Suspicion Standard", with the results of which I in some instances disagree, presages additional judicial involvement in prison administration, and makes civil contempt or section 1983 liability contingent on the *ex post facto* determination by a judge or jury of what constitutes reasonable suspicion.

I would not place prison guards in the same category as those who, when crossing our nation's borders, have no choice but to submit to Customs inspection. No one forces a person to become a guard. One who chooses employment in a penal institution must recognize that it has "peculiar needs", *United States v. Chatman*, 538 F.2d 567, 569 (4th Cir.1976), one of which is the regulation of articles being introduced into the institution. *Id.; Gettleman v. Werner, supra*, 377 F.Supp. at 451–53. Although such needs should have little or no effect on employees' rights of free speech and association, *see Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), their right of privacy must yield to the need for the State to maintain institutional order and discipline. *See id.* "That which would be unreasonable in the outside world may be indispensable within a prison." *Newman v. State of Alabama*, 559 F.2d 283, 291 (5th Cir.1977), *rev'd in part on other grounds sub nom. Alabama v. Pugh and cert. denied*, 438 U.S. 781, 915, 98 S.Ct. 3057, 3144, 57 L.Ed.2d 1114, 1160 (1978). Like workers in a diamond mine, prison employees should recognize that exposure to search is an integral part of their employment. Because of the powder-keg nature of a prison and the fact that guards enter prison employment with their eyes wide open, I would place no greater limitation on strip searches than that they not be conducted arbitrarily, capriciously, or in bad faith. *See Daughtery v. Harris*, 476 F.2d 292, 294–95 (10th Cir.), *cert. denied*, 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973); *Evans v. Moseley*, 455 F.2d 1084, 1086 (10th Cir.), *cert. denied*, 409 U.S. 889, 93 S.Ct. 160, 34 L.Ed.2d 146 (1972); *United States v. Kelley*, 393 F.Supp. 755, 756–57 (W.D.Okla.1975). A federal court injunction which forbids prison administrators on pain of contempt from proceeding on anything less than "reasonable suspicion" constitutes an unwarranted interference in prison administration.

Because the issuance of a search warrant depends upon a showing of probable cause, *Nathanson v. United States*, 290 U.S. 41, 46, 54 S.Ct. 11, 12, 78 L.Ed. 159 (1933), a requirement that a search warrant be obtained before a body cavity search for prison contraband can be conducted is "completely unrealistic". *Daugherty v. Harris, supra*, 476 F.2d at 294–95. Appellants' constitutional rights of privacy must be measured by whether appellants have an expectation of privacy which society is prepared to recognize as reasonable. *United States v. Head*, 546 F.2d 6, 8 (2d Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977). Such recognition depends in part upon "whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 533, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967). The specificity concerning time, place, and likelihood of discovery that would be required in an application for a body cavity search warrant and the difficulty of anticipating the need for such a warrant make it impractical and almost impossible to secure a proper warrant. *See Committee for GI Rights v. Callaway*, 518 F.2d 466, 474–77 (D.C.Cir. 1975). Recognizing that the "complex and intractable" problems of prison administration call for a "broad hands-off attitude" on the part of the courts, *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974), I would treat body cavity searches in the same manner as strip searches in general. *See Bell v. Wolfish, supra*, 441 U.S. at 558–60, 99 S.Ct. at 1884–85; *Daugherty v. Harris, supra*, 476 F.2d at 294–95. At most, I would apply the "reasonable suspicion" standard which my colleagues apply to ordinary strip searches. *See Hodges v. Klein*, 412 F.Supp. 896, 903 (D.N.J.1976). I do not believe that, under the "unique" conditions which prevail in a penal institution, the Constitution mandates the issuance of a search warrant.